ACME PRINTING INK COMPANY, a Delaware corporation, Plaintiff,

v.

MENARD, INC., a Wisconsin corporation; Ed's Masonry and Trucking, Inc., a Wisconsin corporation; Edward J. Fadrowski; Marcia Smith; Anthony Ivancich; Bel–Aire Enterprises, Concrete Contractors, Inc., a Wisconsin corporation; Brey's Saw Shop, a partnership; Dan Brey; Max Brey; Cambridge Chemical, Inc., a Wisconsin corporation Cardinal Fabricating Corp., a Wisconsin corporation; John A. Davis, Jr.; Commercial Heat Treating, Inc., a Wisconsin corporation; Herb Engel Realty Co., Inc., a Wisconsin corporation; Hartwig, Inc., a Wisconsin corporation, d/b/a Hartwig Exhibitions; Helmut's Building Service, Inc., a Wisconsin corporation; Kramer Brass Foundry, Inc., a Wisconsin corporation; Dennis J. Cortte, d/b/a Layton Motor Sales; Jerry Lesperance, d/b/a Lesperance Construction; Lincoln Savings Bank, S.A., f/k/a Lincoln Savings & Loan Association, a Wisconsin chartered savings and loan association; Vernin Tretow, d/b/a Loomis Center Garage; Lubricants, Inc., a Wisconsin corporation; Richard W. Drexler; Robert Howell; Miller Tilt–Top Trailer, Inc., a Wisconsin corporation; Lewis Miller; Robert Bera; Pemper Engineering Co., Inc., a Wisconsin corporation; Frank Povlick, Inc., a Wisconsin corporation; Charles E. Rickheim; Service Painting Corp., a Wisconsin corporation; Sun Control Corporation, a/k/a Milwaukee Venetian Blind Co., a Wisconsin corporation; Supreme Casting, Inc., a Wisconsin corporation; Texaco, Inc., a for-

eign corporation; Wauwatosa Savings & Loan, a loan association; Williams Petroleum, Inc., a Wisconsin corporation; Cigna Property and Casualty Companies, a Connecticut corporation; Ranger Insurance Company, a Delaware corporation; Hartford Accident & Indemnity Company, a Connecticut corporation; Employers Insurance of Wausau, a Wisconsin corporation; and Reliance Insurance Company, a Pennsylvania corporation, Defendants,

v.

TRAVELERS COMPANIES, INC., a Connecticut corporation and Home Insurance Co., Inc., a New Hampshire corporation, Third–Party Defendants.

CAMBRIDGE CHEMICAL, INC., a Wisconsin corporation, Third–Party Plaintiff,

v.

HARTFORD ACCIDENT & INDEMNITY CO., a Connecticut corporation, Third–Party Defendant.

No. 89–C–834.

United States District Court, E.D. Wisconsin.

Dec. 5, 1994.

See also 812 F.Supp. 1498.

William S. Roush, Jr., Davis & Kuelthau, Milwaukee, WI, for plaintiff.

Robert W. Corey, Menard, Inc. Legal Dept., Eau Claire, WI, for Menard, Inc.

Edward R. Cameron, Milwaukee, WI, for Ed's Masonry and Trucking Edward J. Fadrowski [deceased].

Anthony Ivancich, pro se.

Timothy J. Strattner, Schellinger & Doyle, Brookfield, WI, for Bel–Aire Enterprises Concrete Contractors, Inc.

Bruce C. O'Neill, Fox, Carpenter, O'Neill & Shannon, Milwaukee, WI, for Cambridge Chemical, Inc.

Daniel M. Leep, McNally, Maloney & Peterson, Milwaukee, WI, for Cardinal Fabricating Corp. and Robert Howell.

William Wiseman, O'Neil, Cannon & Hollman, Milwaukee, WI, for Chromium, Inc.

James A. Baxter, Mitchell, Baxter, O'Meara & Mathie, Milwaukee, WI, for Kramer Brass Foundry, Inc.

William H. Harbeck, Quarles & Brady, Milwaukee, WI, for John A. Davis, Jr.

Steve Enich, Charles Johnson, Milwaukee, WI, for Commercial Heat Treating.

Herb Engel Realty Co., c/o Mr. Gerald L. Engel, Milwaukee, WI, for Herb Engel Realty Co.

Raymond J. Pollen, Crivello, Carlson, Mentkowski & Steeves, S.C., Milwaukee, WI, for Hartwig, Inc. d/b/a Hartwig Exhibitions.

Stuart B. Eiche, Schulz, Schapekahm & Eiche, Milwaukee, WI, for Helmut's Bldg. Service.

John A. Fiorenza, John P. Hayes, Fiorenza & Hayes, Milwaukee, WI, for Williams Petroleum.

Michael P. Carlton, von Briesen & Purtell, Milwaukee, WI, for Dennis J. Cortte d/b/a Layton Motor Sales.

Michael W. Rohr, Krawczyk & Duginski, Milwaukee, WI, for Lincoln Sav. Bank and Pemper Engineering Co.

Tom Duggan, John T. Lynch, Duggan, Lynch & Fons, Greenfield, WI, for Vernin Tretow d/b/a Loomis Center Garage.

Richard Drexler, c/o Lubricants, Inc., Milwaukee, WI, for Lubricants, Inc.

Thomas S. Sommers, Sommers & Sommers, Milwaukee, WI, for Richard W. Drexler.

David V. Meany, Michael, Best & Friedrich, Milwaukee, WI, for Service Painting Corp.

Richard E. Schmidt, Fellows, Piper & Schmidt, Milwaukee, WI, for Frank Povlick, Inc.

Michael P. Dunn, Davis & Kuelthau, Milwaukee, WI, for Supreme Casting, Inc.

Jeffrey P. Clark, Reinhart, Boerner, Van Deuren, Norris & Rieselbach, Milwaukee, WI, for Texaco.

Michael Pfau, Thomas Schrimpf, Hinshaw & Culbertson, Milwaukee, WI, for Ranger Ins. Co.

Richard M. Hagstrom, Zelle & Larson, Minneapolis, MN, Michael R. Wherry, Davis & Kuelthau, Milwaukee, WI, for Employers Ins. of Wausau.

Ralph A. Weber, Kravit, Gass & Weber, Milwaukee, WI, for The Travelers Companies, Inc. and The Home Ins. Co.

Lawrence K. Rynning, Williams & Montgomery, Ltd., Chicago, IL, for Home Ins. Co.

Paul J. Pytlik, Otjen, Van Ert, Stangle, Lieb & Weir, Milwaukee, WI, for Hartford Acc. & Indem.

Jeffrey Leavell, Kevin Harrington, Jeffrey Leavell, S.C., Racine, WI, for Waukesha Rubber Co.

## DECISION AND ORDER

WARREN, District Judge.

Now before the Court are several motions in the above-captioned case. Plaintiff Acme Printing Ink, Co. ("Acme") has moved the Court for partial summary judgment against defendant Menard, Inc. ("Menard") as to Menard's liability under the Resource Conservation and Recovery Act ("RCRA"), 42 U.S.C. § 6972, and the Comprehensive Environmental Response Compensation and Liability Act ("CERCLA"), 42 U.S.C. § 9607. For the following reasons, this motion will be granted in part and denied in part. Also before the Court are the "fast-track" summary judgment motions of several defendants requesting the Court to dismiss all claims and cross-claims against them. The resolution of these motions will be addressed individually in the body of this decision.

## I. BACKGROUND

Between 1970 and 1982, the property at the center of this dispute in the 6800 block of South 27th Street in Franklin, Wisconsin was owned by Edward J. Fadrowski. During that period, Fadrowski operated an unregulated and unlicensed landfill and Christmas tree farm on the property. Because the site was unlicensed, Fadrowski could only legally dump earth fill containing less than 25% by volume of brick, concrete, and building stone.

Fadrowski also owned and operated a waste collection and transportation company called Ed's Masonry and Trucking ("Ed's Trucking"). During that time period, Ed's Trucking was licensed by the Wisconsin Department of Natural Resources (DNR) to collect and transport noncombustible waste,

wood matter, refuse and garbage. The motto of Ed's Trucking was "You call, We haul." And haul it did, picking up rubbish and solid waste from various area businesses and dumping it at several landfills in the area, including the site at South 27th Street. Clients of Ed's Trucking included the plaintiff, Acme Printing Ink Company ("Acme"), as well as others including: Cambridge Chemical, Inc.; Cardinal Fabricating Corp.; Chromium, Inc.; Commercial, Inc.; Commercial Heat Treating, Inc.; Herb Engel Realty Co., Inc.; Hartwig, Inc.; Helmut's Building Service, Inc.; Kramer Brass Foundry, Inc.; Layton Motors; Lincoln Savings & Loan Association; Loomis Center Garage; Lubricants, Inc.; Miller Tilt–Top Trailer, Inc.; Pemper Engineering Co., Inc.; Service Painting Corp.; Sun Control Corporation; Texaco, Inc.; Bel–Aire Enterprises; and Williams Petroleum, Inc.

In the late 1970s and early 1980s, several incidents occurred which suggest that Fadrowski was illegally hauling and dumping hazardous wastes. The first documented incident involved Ed's Trucking. On October 20, 1978, Fadrowski's driver, Tony Ivancich, spilled a significant quantity of sludge waste that he was transporting from Lubricants, Inc. onto South 84th Street. Mr. Fadrowski was billed by the City of Greenfield for the costs incurred cleaning-up the spilled sludge. Ivancich later admitted that this type of waste was not only frequently hauled by Ed's Trucking, but was also commonly transported to the site. *Deposition of Anthony Ivancich* (February 2, 1990) at 15. *See also Deposition of Marcia Smith* (February 1, 1990) at 77. The next incident occurred in February of 1981, when Roger Klett, a DNR landfill inspector, inspected the Fadrowski site and found that Fadrowski was dumping regulated wastes illegally. Mr. Klett notified the City of Franklin's City Engineer, Mr. John Bennett, of the results of his inspection. *Letter from Roger Klett to Edward Fadrowski*, (February 2, 1981).

On July 6, 1981, the Wisconsin DNR received a complaint from Marcia Smith, a Fadrowski employee, about operations at the Fadrowski site. Ms. Smith alleged that Fadrowski was illegally dumping drums of haz- ardous wastes from Acme Printing Ink Company and Lubricants, Inc. at the site. An inspection on July 6, 1981 by Klett and Victor Pappas, also of the Wisconsin DNR, revealed the existence of regulated wastes that had been illegally deposited at the site. However, the DNR was unable to confirm the existence of any drums containing the material described by Smith. The DNR did not pursue the investigation further because Ms. Smith refused to submit an affidavit in support of her allegations. The DNR issued Fadrowski a warning but never required him to get a permit.

As a result of several of these incidents, on December 8, 1981, Franklin City Engineer John Bennett met with Mr. Fadrowski to request that he bring the his landfill up to standards required by the City and State Codes. Later Bennett sent Fadrowski a letter confirming the arrangements they had made to bring the site up to code. *Letter from John Bennett to Ed Fadrowski* (December 18, 1981).

In December of 1982, Menard decided to purchase the property at South 27th Street, along with other adjacent plots, to build a Menard's retail outlet. Before purchasing Fadrowski's property, Marv Prochaska, Menard Vice President of Real Estate, conducted a physical inspection of the site. Prochaska made inquiries of the realtor regarding what materials were disposed of in the Fadrowski landfill, and was assured that the landfill contained only construction materials, concrete, and dirt. Menard also checked the files on the Fadrowski site at the offices of the City of Franklin. The files contained the above mentioned correspondence between the City Engineer, Bennett, and Fadrowski. However, Menard never followed up with a more complete investigation. *Deposition of Marv Prochaska* (January 30, 1990) at 29.

On January 5, 1983, the sale of the Fadrowski site to Menard was finalized. Shortly thereafter, Menard began work on its new facility. Excavation of the site was started by Menard's contractor on April 8, 1993, and continued virtually uninterrupted through June 28, 1983. On June 28, 1983, while excavating the site, workers operating mechanized shovels and bulldozers broke open

several containers which had been buried at the site. *Deposition of Everett Morgan* (November 8, 1989) at 21–31; *Deposition of Robert Gassert* (November 9, 1989) at 43. The workers continued their work even though their machines were spreading liquid waste around the site. Several containers were broken open before one of the bulldozers was hit by a stream of liquid waste that erupted from one of the containers. The workman in the bulldozer, Everett Morgan, was so overcome by fumes he shut down his bulldozer and reported the incident to his foreman. *Morgan Deposition* (November 8, 1989) at 41–42. The Franklin Fire Department was contacted and it in turn contacted the DNR. When the DNR inspector arrived at the site, the workers had uncovered and spread about the site black, red, green, orange, and yellow sludge that had a distinct odor of paint or solvent. *Deposition of Frank Trcka* (March 6, 1990) at 17–19; Plaintiff's Exhibit 82.

Upon further inspection and analysis, it was determined that the Fadrowski site did in fact contain hazardous wastes. Eventually, the site was placed on the National Priority List ("NPL") by the Environmental Protection Agency ("EPA"). On April 17, 1987, Acme entered into a consent order with the EPA and DNR, in which Acme agreed to undertake a Remedial Investigation and Feasibility Study ("RI/FS") in connection with the site. Defendant Menard's Exhibit 93, §§ VIII(A), IX(C). Acme filed this action on July 19, 1989 seeking contribution from Menard and many other potentially responsible parties ("PRPs") for the response costs that it allegedly incurred in connection with the site.

## II. LEGAL STANDARD

### A. Statutory Framework

The claims at issue in this litigation arise out of two major pieces of environmental legislation: (1) the Resource Conservation and Recovery Act ("RCRA"); and (2) the Comprehensive Environmental Response, Compensation and Liability Act ("CERCLA").

### 1. RCRA

Subtitle C of RCRA was designed to provide for cradle-to-grave regulation of hazardous waste. Subtitle C required the Environmental Protection Agency ("EPA") to adopt regulations which identify the characteristics of hazardous waste, list regulated hazardous wastes, establish standards applicable to generators of hazardous waste, and establish performance standards applicable to owners and operators of hazardous waste treatment, storage or disposal facilities. 42 U.S.C. §§ 6921–6924.

RCRA permits the EPA to delegate responsibility for the implementation of the statute and its required regulations to the states. 42 U.S.C. § 6926. The State of Wisconsin has taken advantage of this option and is authorized to administer and enforce the Wisconsin hazardous waste program in lieu of the federal program. 40 CFR § 272.2500(a). EPA's approval of the state program, as administered by the Wisconsin DNR, was effective January 31, 1986. *Id.; see* 51 Fed.Reg. 3783. However, the delegation to the State of final authorization did not include responsibility for any of the provisions added to RCRA by the Hazardous and Solid Waste Amendments of 1984. 40 CFR § 272.2500(b).

The licensing of a treatment, storage or disposal facility under the Wisconsin program is governed by Wis.Stats. § 144.64(2). That section of the Wisconsin plan prohibits anyone from operating a hazardous waste facility without a permit. DNR may issue interim licenses to persons who operate hazardous waste facilities if the facility was in existence on November 19, 1980. Wis.Stats. § 144.64(2)(c). Any person required to be licensed or eligible to obtain a license under § 144.64(2)(c) who does not obtain an interim license must submit a plan for final closure and long-term care of the facility to DNR. Wis.Stats. § 144.64(2m); Wis.Admin.Code § NR 680.60. The facility closure requirements are fully set forth in §§ NR 685.05 and 660.15.

Owners or operators of hazardous waste disposal facilities that accepted hazardous waste after July 26, 1982 are also required to install and maintain a groundwater and

leachate monitoring system. Wis.Admin.Code § NR 635.12. The monitoring plan must be submitted to DNR for approval, and it must include at least two upgradient monitoring points to determine the background quality of groundwater, four or more downgradient monitoring points, and two or more sampling devices directly below the facility to detect any statistically significant release of pollutants from the facility. Wis.Admin.Code § NR 635.12(1)a–b.

The Wisconsin plan also provides that when there is a discharge of hazardous substances from a facility, the person who possesses or controls the substances which are discharged or who causes the discharge is required to "take the actions necessary to restore the environment to the extent practicable and minimize the harmful effects from the discharge to the air, lands or waters of this state." Wis.Stats. § 144.76(3).

Although the requirements of RCRA and the Wisconsin Hazardous Waste Management Plan are generally enforced through government action, RCRA does include a provision authorizing citizen suits. RCRA permits any citizen to file suit in federal district court against any person to enforce the requirements of the statute, 42 U.S.C. § 6972(a)(1)(A), or to abate an imminent and substantial endangerment to human health or the environment. 42 U.S.C. § 6972(a)(1)(B).

### 2. CERCLA

CERCLA was designed to force the cleanup of abandoned hazardous waste sites that pose some risk to public health or the environment. The statute gives the federal government the power to clean-up sites contaminated by hazardous substances, either by arranging for the clean-up itself or by ordering a potentially responsible party ("PRP") to do so. 42 U.S.C. §§ 9604, 9606. CERCLA also authorizes cost recovery actions by private parties who have incurred costs in undertaking clean-up activities. 42 U.S.C. § 9607. Unlike RCRA, CERCLA does not provide for the delegation of federal regulatory power to the states. CERCLA does, however, create substantial inducements for private party investigation and clean-up efforts.

While the statute allows EPA to initiate and perform clean-up action at a site, EPA may also request and, if need be, force, PRPs to do the work. 42 U.S.C. § 9606. EPA may also enter into agreements with private parties to perform any necessary response work if EPA determines that the work will be done properly by such party. 42 U.S.C. § 9622(a), (d)(3). When such an agreement is entered into, the EPA sets forth the terms in an administrative order by consent. 42 U.S.C. § 9622(a), (d)(3).

CERCLA creates broad liability for any response costs incurred in connection with the actual or threatened release of hazardous substances. 42 U.S.C. § 9607. Liability for such costs may be imposed on: (1) the current owner or operator of the facility; (2) the owner or operator of the facility at the time hazardous materials were disposed of; (3) any person who arranged for the disposal of hazardous materials at the facility; and (4) any person who transported the hazardous waste to the disposal facility. 42 U.S.C. § 9607(a).

Cost recovery actions against PRPs may be brought by the federal government, by a state or local agency, or by "any other person" that has incurred response costs consistent with the National Contingency Plan ("NCP") for which someone else may or should be liable. 42 U.S.C. § 9607(a)(1)–(4). The only defenses to liability are those specifically set forth in the statute, *see, e.g., National Acceptance Co. of America v. Regal Products, Inc.,* 155 F.R.D. 631, 636 (E.D.Wis. 1994); *Kelley v. Thomas Solvent Co.,* 714 F.Supp. 1439, 1445 (W.D.Mich.1989), and include: (1) an act of God; (2) an act of war; (3) an act or omission of an unrelated third party; or (4) any combination of the foregoing. 42 U.S.C. § 9607(b).

### B. Summary Judgment

Federal Rule of Civil Procedure 56 provides that a district court shall grant summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,

show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). The mere existence of some factual dispute does not defeat a summary judgment motion; "the requirement is that there is a *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). For a dispute to be genuine, the evidence must be such that a "reasonable jury could return a verdict for the nonmoving party." *Id.* For the fact to be material, it must relate to a disputed matter that "might affect the outcome of the suit." *Id.* Thus, "[f]actual disputes that are irrelevant or unnecessary will not be counted." *Id.*

The initial burden is on the moving party to show that there are no material facts in dispute and that judgment should be entered in its favor. *Hannon v. Turnage,* 892 F.2d 653, 656 (7th Cir.1990). The burden then shifts to the nonmoving party, which must then "go beyond the pleadings" and designate specific facts to support each element of its cause of action, showing that there is a genuine issue for trial. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986); *Whetstine v. Gates Rubber Co.,* 895 F.2d 388, 392 (7th Cir.1990). In evaluating a motion for summary judgment, the Court must draw all reasonable inferences in favor of the nonmoving party. *Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *Johnson v. Pelker,* 891 F.2d 136, 138 (7th Cir. 1989).

## III. DISCUSSION

### A. Acme's Motion for Partial Summary Judgment Against Menard

In its motion for partial summary judgment, Acme asks the Court to find Menard liable as a matter of law under both RCRA

and CERCLA as the current owner of the Fadrowski site.

### 1. RCRA Liability

Pursuant to the authority of RCRA's citizen suit provisions, Acme asserts the following claims against Menard. First, pursuant to 42 U.S.C. § 6972(a)(1)(A), Acme alleges that Menard is operating a hazardous waste facility in violation of the requirements of the Wisconsin Hazardous Waste Management Plan. Acme seeks an order to compel Menard to comply with the statutory and regulatory requirements and a declaration that Menard is liable for civil penalties. Second, pursuant to 42 U.S.C. § 6972(a)(1)(B), Acme alleges that the Fadrowski site presents an imminent and substantial danger to the environment and requests that the Court order Menard to abate the endangerment.

### a. Regulatory Enforcement Action—42 U.S.C. § 6972(a)(1)(A)

RCRA section 6972(a)(1)(A) provides that any person may commence a civil action "against any person ... who is alleged to be in violation of any permit, standard, regulation, condition, requirement, prohibition or order." Acme alleges that Menard has violated and continues to violate the following parts of the Wisconsin Hazardous Waste Management Plan ("WHWMP"):[1] (1) operating a hazardous waste facility without an interim or operating license; (2) failing to submit to DNR a closure and long-term care plan for the facility; (3) failing to take such actions as are necessary to prevent unknowing or unauthorized entry into the facility; (4) failing to install and maintain groundwater leachate monitoring systems; and (5) failing to take the actions necessary to restore the environment following the discharge of hazardous wastes at the site.

In opposition to Acme's motion, Menard argues that Acme is not entitled to bring an enforcement action under this provision because: (1) the Fadrowski site is not an exist-

---

1. Because the Wisconsin Hazardous Waste Management Plan operates "in lieu of" RCRA, 42 U.S.C. § 6926(b), Acme may only sue for violations of the state regime and not for violations of the federal regime. *See Clorox Co. v. Chromium*

*Corp.,* 158 F.R.D. 120 (N.D.Ill.1994). However, throughout this analysis, because the federal and state regulatory regimes are so similar, the Court will refer to RCRA case law for guidance in interpreting the WHWMP.

ing, operating facility; (2) there is an ongoing EPA/DNR enforcement action which acts as bar to Acme's suit; and (3) Acme's motion relates to wholly past violations of RCRA and is therefore outside the scope of this section of RCRA.

The threshold issue is whether Menard is even subject to the requirements of the WHWMP. If it is not, Acme cannot hold Menard liable for any violations of the regulations that may have occurred. In order to be subject to the Wisconsin plan, Menard must be a regulated person under the statute. Acme alleges that Menard is a regulated person as the owner of a hazardous waste facility. It is undisputed that Menard owns the Fadrowski site; the question is whether the site is a hazardous waste facility.

Menard argues that because disposal activities at the site ceased long ago, the requirements of the WHWMP are inapplicable to it. In contrast, Acme contends that the fact that Menard is no longer receiving hazardous waste at the site does not mean that the site is no longer operating. Acme argues that the site is still operating for the purposes of the WHWMP regulations because under the Wisconsin plan, a hazardous waste site must either obtain an operating license or be closed down. Wis.Stats. § 144.64(2)–(2m). Closing the site means more than simply ceasing to accept waste; it also requires that the owner of the site prepare the site for long-term care. Wis.Stats. § 144.43(1m). Thus, argues Acme, in order for the site to cease being subject to the WHWMP, it must comply with the formal statutory and regulatory closure requirements outlined in Wis. Stats. 144.44 and Wis.Admin.Code NR § 685. Menard has not done so. Therefore, according to Acme, Menard is still subject to Wisconsin hazardous waste management regulatory authority.

■ As far as the Court is aware, Acme's novel theory of RCRA liability presents an issue of first impression. Based on its analysis of the statutory language, the structure and history of RCRA, and RCRA's relation to other environmental statutes, the Court concludes that Menard is not the owner of an *operating* hazardous waste facility, and is therefore not subject to—and thus not in

violation of—the WHWMP statute and regulations.

First, the WHWMP applies only to "facilities." The Wisconsin plan defines hazardous waste facility as:

[A] site or structure for the treatment, storage or disposal of hazardous waste and includes all of the contiguous property under common ownership or control surrounding the site or structure.

Wis.Stats. § 144.61(5m). The "for the treatment, storage or disposal of hazardous waste" language in the statute suggests that the regulations restrict coverage to facilities that are *intended* to be used for disposal, treatment or storage of hazardous waste. Acme has introduced no evidence that Menard uses or ever used the site for disposal of hazardous waste. The structure of the WHWMP with its permit process, suggests that the plan attempts to regulate currently operating hazardous waste facilities. If anything, the Fadrowski site is a former hazardous waste facility, as the function it was established to perform is no longer being served.

■ Furthermore, RCRA and the WHWMP are primarily prospective regulatory regimes. Neither was designed to address violations that occurred in the past. *See Gwaltney v. Chesapeake Bay Foundation Inc.*, 484 U.S. 49, 57, 108 S.Ct. 376, 381, 98 L.Ed.2d 306 (1987) (only prospective relief authorized under this provision of RCRA); *Coburn v. Sun Chemical Corp.*, 1988 WL 120739 (E.D.Penn. Nov. 9, 1988) ("[W]e find that Section 7002(a)(1)(A) of RCRA bars any suit based on 'wholly past' violations of RCRA."); H.R. 1016, 96th Cong., 2d Sess., at 22, *reprinted in* 1980 U.S.Code Cong. & Admin.News at 6125 ("[RCRA] is prospective and applies only to past sites to the extent that they are posing an imminent hazard."). Moreover, the 1984 Amendments to RCRA added a provision—42 U.S.C. § 6972(a)(1)(*B* )—which was designed to create RCRA liability for past violations which present current danger. In concluding that § 6972(a)(1)(A) of RCRA provides for only prospective relief, the Supreme Court in *Gwaltney* pointed to 42 U.S.C.

§ 6972(a)(1)(B) as an example of how Congress knows how to create relief for past violations if it wants to. *Gwaltney*, 484 U.S. at 56 n. 2, 108 S.Ct. at 381 n. 2.

Finally, these provisions of RCRA must be examined in light of the statutory scheme Congress enacted through CERCLA. CERCLA is designed to accomplish exactly what Acme seeks to accomplish through section 6972(a)(1)(A) of RCRA—the clean-up of a site which was formerly used to dispose of hazardous waste. *See United States v. Wade*, 546 F.Supp. 785, 789 (E.D.Penn.1982) ("It was ... the perceived inapplicability of RCRA ... to the effects of past unsafe disposal practices that led to the 1980 CERCLA legislation.").

Therefore, the Court concludes that section 6972(a)(1)(A) does not apply to the Fadrowski site because Menard is not currently operating, nor has it operated, a hazardous waste facility.[2] Therefore, it cannot be liable for violating the WHWMP because it has never been subject to the plan's regulations. Accordingly, Acme's motion for summary judgment under this provision will be denied.

### b. Imminent and Substantial Endangerment—42 U.S.C. § 6972(a)(1)(B)

Section 6972(a)(1)(B) of RCRA *is* the appropriate provision under which to bring a citizen suit to address problems at sites, like the Fadrowski site, where the violations of RCRA occurred in the past. It authorizes citizen suits:

> [A]gainst any person ... including ... any past or present generator, past or present transporter, or past or present owner or operator of a treatment, storage or disposal facility, who has contributed or who is contributing to the past or present handling, storage, treatment, transportation, or disposal of any solid or hazardous waste which may present an imminent and substantial endangerment to health or the environment.

42 U.S.C. § 6972(a)(1)(B). *See also Gwaltney*, 484 U.S. at 57 & n. 2, 108 S.Ct. at 381 n. 2 (concluding that the 1984 Amendments to RCRA which added § 6972(a)(1)(B) "explicitly target[ ] wholly past violations").

In order to maintain a cause of action under this section, Acme must show (1) that the conditions at the Fadrowski site may present an imminent and substantial endangerment to health or the environment, (2) that the endangerment stems from the past or present handling, treatment or disposal of solid or hazardous waste, and (3) that Menard contributed to such handling, treatment or disposal of the solid or hazardous waste. *See United States v. Aceto Agr. Chemicals Corp.*, 872 F.2d 1373, 1382–83 n. 9 (8th Cir. 1989) *citing United States v. Bliss*, 667 F.Supp. 1298, 1313 (E.D.Mo.1987); *United States v. Conservation Chemical Co.*, 619 F.Supp. 162, 199–200 (W.D.Mo.1985).[3]

In attempt to satisfy the first requirement and show that the Fadrowski site poses an imminent and substantial danger, Acme points to the fact that hazardous wastes are present at the site and that the site is not secure from inadvertent or unauthorized entry. Acme further points to the fact that the site has been placed on the NPL by EPA as evidence that the agency views the site as dangerous.

Courts have been understandably reluctant to find the existence of an imminent and substantial endangerment as a matter of law. The cases cited by Acme in support of such a finding are generally inapposite, as they were not decided at the summary judgment stage. The *Aceto* case involved a defendant's motion to dismiss for a failure to state a claim upon which relief can be granted. There, the allegation of an imminent and substantial endangerment was enough. *Aceto*, 872 F.2d at 1376. In the other cases cited by Acme, the courts declared an imminent and substantial endangerment *after* conducting a factual hearing. *See Daque v. Burling-*

---

2. Having reached this conclusion, the Court need not address Menard's other arguments opposing Acme's motion.

3. This test was formulated pursuant to § 6973, which is nearly identical to § 6972(a)(1)(B), except that § 6973 permits the *EPA* to seek abatement of imminent and substantial hazards. *See Comite Pro Rescate De La Salud v. Sewer Authority*, 888 F.2d 180, 187 (1st Cir.1989) (Sections 6973 and 6972(a)(1)(B) "nearly identical").

*ton,* 732 F.Supp. 458, 461 (D.Vt.1989) *aff'd* 935 F.2d 1343 (2d Cir.1991); *United States v. Vertac Chemical Corp.,* 489 F.Supp. 870, 873 (E.D.Ark.1980). *Contra Conservation Chemical,* 619 F.Supp. at 175 (concluding as a matter of law that a site poses an imminent and substantial endangerment where, by defendant's own estimates, *22,000 pounds* of hazardous substances were being discharged into the Missouri River each year).

Acme would have to present extremely convincing evidence to support a summary judgment motion on a fact-intensive question such as this. While it is true that the Court may grant judgment pursuant to § 6972(a)(1)(B) without finding that a true emergency presently exists, *see Aceto,* 872 F.2d at 1383, there is presently insufficient information before the Court to make a determination of whether the Fadrowski site poses an imminent and substantial endangerment. This is especially so given the length of time that has elapsed since Acme's summary judgment motion was filed.

Because the Court concludes that there is a material and genuine dispute of fact as to whether the site poses an imminent and substantial danger, the Court need not reach the question of whether Acme has satisfied the other elements of the § 6972(a)(1)(B) test. Accordingly, the Court concludes that summary judgment on Acme's § 6972(a)(1)(B) claim is not warranted, and its motion will therefore be denied.

## 2. CERCLA Liability

██ In its motion for partial summary judgment, Acme seeks a declaration of liability against Menard pursuant to section 107 of CERCLA. 42 U.S.C. § 9607. Acme is entitled to summary judgment on Menard's liability if it can establish each of the elements on which CERCLA liability is based, 42 U.S.C. § 9607(a), and Menard cannot establish the applicability of any defense listed in the statute. 42 U.S.C. § 9607(b). *Environmental Transportation Systems, Inc. v. EN-*

*SCO, Inc.,* 969 F.2d 503, 506 (7th Cir.1993); *Amoco Oil v. Borden,* 889 F.2d 664, 668 (5th Cir.1989). The plaintiff may establish liability under CERCLA section 107 if: (1) the site in question is a "facility" as defined in 42 U.S.C. § 9601(9); (2) the defendant is a responsible person under § 9607(a); (3) a release or threatened release of a hazardous substance has occurred; and (4) the release or threatened release has caused the plaintiff to incur response costs. *Kerr–McGee Chemical Corp. v. Lefton Iron and Metal Co.,* 14 F.3d 321, 325 (7th Cir.1994).

That Acme has satisfied these elements of liability is not in dispute. First, section 101(9) defines "facility" to include just about every place hazardous waste might be found. *See e.g., United States v. Conservation Chemical Co.,* 619 F.Supp. 162, 185 (W.D.Mo. 1985) (defining facility to include "every place where hazardous substances come to be located"). Therefore, the Fadrowski site is a "facility" under § 9601(9). Second, responsible parties include current or past owners and operators of the site, persons who arrange for the disposal of hazardous waste at the site or persons who transport hazardous waste to the side. 42 U.S.C. § 9607(a). Menard is the current owner of that site and thus a responsible person under § 9607(a)[4]. Third, hazardous substances were present at the Fadrowski site and were released into the environment when Menard excavated the landfill. Finally, the release has caused Acme to incur response costs; pursuant to the EPA consent order, Acme has expended substantial funds in performing the RI/FS. *See Ascon Properties, Inc. v. Mobil Oil Co.,* 866 F.2d 1149, 1154 (9th Cir.1989); *Amcast Indus. Corp. v. Detrex,* 822 F.Supp. 545, 554 (N.D.Ind.1992) *aff'd in part and rev'd in part on other grounds Amcast Indus. Corp. v. Detrex,* 2 F.3d 746 (7th Cir.1993).

Because Acme has established a prima facie case of CERCLA liability, the only matter at issue in this motion is whether Menard

---

4. Acme further alleges that Menard is a responsible person as one who arranged for the disposal of hazardous waste because it "intentionally excavated the landfill, moved the hazardous waste about the site, ruptured the containerized wastes, mixed the hazardous wastes with other wastes, and then buried and abandoned the wastes it generated." (Plaintiff's Memorandum in Support of Motion for Partial Summary Judgment at 48). *See Tanglewood East Homeowners v. Charles–Thomas Inc.,* 849 F.2d 1568, 1573 (5th Cir.1988).

**1480**

can establish one of the affirmative defenses set forth at 42 U.S.C. § 9607(b). Menard contends that it can establish one such defense, claiming that there is a genuine issue as to whether it is an innocent landowner/purchaser under section 107(b)(3). That section provides:

There shall be no liability ... for a person otherwise liable who can establish by a preponderance of the evidence that the release or threat of release of a hazardous substance and the damages resulting therefrom were caused solely by—

\* \* \* \* \* \*

(3) an act or omission of a third party other than an employee or agent of the defendant, or than one whose act or omission occurs in connection with a contractual relationship, existing directly or indirectly, with the defendant ... if the defendant establishes by a preponderance of the evidence that (a) he exercised due care with respect to the hazardous substance concerned ... and (b) he took precautions against foreseeable acts or omissions of any such third party and the consequences that could foreseeably result from such acts or omissions.

42 U.S.C. § 9607(b).

■ Because section 107(b)(3) is an affirmative defense, Menard has the burden of establishing by a preponderance of the evidence that it is not liable under CERCLA because it is an innocent landowner. Thus, Menard has the burden to make a showing sufficient to establish the existence of a material dispute of fact as to whether each of the following elements in the innocent landowner defense can be satisfied:

1. The release or threatened release of a hazardous substance and the resulting damages were caused solely by an act or omission of a third party;

2. The third party's act or omission did not occur in connection with a contractual relationship with the defendant;

3. The defendant exercised due care with respect to the hazardous substance; and

4. The defendant took precautions against the third party's foreseeable acts or

omissions and the foreseeable consequences resulting therefrom.

*United States v. Pacific Hide & Fur Depot, Inc.* 716 F.Supp. 1341, 1346–47 (D.Idaho 1989). *See also Steego Corp. v. Ravenal,* 830 F.Supp. 42, 51 (D.Mass.1993).

■ The first, and most glaring defect in Menard's claim to the innocent landowner defense is the undisputed fact that Menard played a significant role in causing the release of hazardous substances at the Fadrowski site. Menard's excavation of the site in 1983 caused barrels of waste to be unearthed and ruptured. In its brief, however, Menard contends that the sole cause of the release or threatened release was the illegal dumping of hazardous substances by an as yet undetermined third party. Nonetheless, Menard admits that "[s]ome hazardous substances may have been spilled from the illegally dumped barrels when Menard's contractor was excavating the site." *Memorandum of Defendant Menard, Inc. in Opposition to Motion for Partial Summary Judgment* at 34. Clearly then because Menard played some role in the release of the hazardous substances at the site, the undetermined third party was not the *sole* cause of the release. Therefore, it cannot invoke the innocent landowner defense.

■ Although Menard's failure to establish the first element of the section 107(b)(3) defense is dispositive, the Court concludes that it is also extremely unlikely that Menard could satisfy the other elements of the defense. For example, in order to show that it had no contractual relationship with Fadrowski and is thus absolved from CERCLA liability, Menard would have to establish that— after undertaking all appropriate inquiry into the prior ownership and use of the property—it neither knew, nor had reason to know, that any hazardous substances were disposed of at the Fadrowski site. 42 U.S.C. § 9601(35). Putting aside the complex issue of whether Menard undertook an appropriate inquiry, the Court concludes Menard should have known that hazardous substances may have been disposed of at the site.

The simple fact that the site was used as a dump by Fadrowski should have put Menard

on notice that hazardous substances might be present there. Moreover, Ed's Trucking was licensed to carry a wide variety of wastes including some that are considered hazardous under CERCLA. Therefore, it was not at all unlikely that Ed's Trucking company could have dumped some hazardous substances at the site. Finally, Menard admitted conducting a pre-purchase search of the City of Franklin files on the Fadrowski site. *Prochaska Deposition* (January 30, 1990) at 29. At that time, the city's files contained the letter written by City of Franklin Engineer, John Bennett, requesting that Fadrowski bring the site into compliance with the City and State codes. Plaintiff's Exhibit 45: Letter from John Bennett to Edward Fadrowski (December 18, 1981). A request of this nature by the City Engineer should have alerted a prudent, sophisticated purchaser, like Menard, that the site was not currently in compliance. All of the information Menard did discover in its investigation should have, at a minimum, led it to inquire further into the prior use of the site.

Therefore, because the Court is satisfied Acme has established all the elements of Menard's liability under section 107(a) of CERCLA and that Menard cannot satisfy several elements of the innocent purchaser defense, the Court concludes that there is no triable issue of fact as to whether Menard is liable to Acme for the response costs it incurred. Accordingly, Acme's motion for partial summary judgment will be granted.

## B. Fast Track Summary Judgment Motions

Pursuant to this Court's scheduling order of February 12, 1990, several defendants in this case have filed "fast-track" summary judgment motions requesting that the Court dismiss all claims against them.[5] These defendants generally argue either that they did not dispose of hazardous wastes at the Fadrowski site or that the waste they did deposit did not contain hazardous substances. Most of these "fast-track" defendants are alleged to be generators of hazardous waste

which ultimately found its way to the Fadrowski site.

As discussed above, in order to state a CERCLA claim under § 9607(a):

[A] plaintiff must allege that (1) the waste disposal site is a "facility" within the meaning of 42 U.S.C. § 9601(9); (2) a "release" or "threatened release" of any "hazardous substance" from the facility has occurred; and (3) such "release" or "threatened release" has caused the plaintiff to incur response costs.

*Ascon Properties v. Mobil Oil Co.*, 866 F.2d 1149, 1152 (9th Cir.1989). *See also United States v. Bliss*, 667 F.Supp. 1298, 1310 (E.D.Mo.1987); *Violet v. Picillo*, 648 F.Supp. 1283, 1289 (D.R.I.1986). In this case, it is undisputed that there has been a "release" or a "threatened release" from a facility and that the release triggered the incurrence of response costs by Acme. Therefore, the only issues for resolution are (1) whether the defendant dumped its waste at the Fadrowski site and (2) whether the hazardous substances found at the site are also found in the defendant's waste.

There appears to be some confusion in the parties' briefs regarding the issue of causation under CERCLA. Where, as here, a plaintiff is seeking recovery from numerous generator potentially responsible parties ("PRPs"), "the issue of causation would involve a factual determination of not whether defendants hazardous waste caused response costs, but, rather, whether a release or threatened release caused plaintiffs to incur response costs." *Arizona v. Motorola*, 805 F.Supp. 742, 746 (D.Ariz.1992). Thus, Acme is not required to show that any particular "fast-track" defendant's waste was the cause or a cause of the release. *See, e.g. Dedham Water Co. v. Cumberland Farms Dairy*, 889 F.2d 1146, 1157 (1st Cir.1989) (holding that CERCLA does not require proof that defendant's hazardous substance in fact contaminated plaintiff's property); *United States v. Ottati & Goss Inc.*, 630 F.Supp. 1361, 1405–

---

5. Throughout this section the Court will refer to Acme as the plaintiff. Although many of these parties are also defendants in cross-claims asserted by other defendants, the legal and factual issues involved are identical. Thus, if the Court concludes that a "fast-track" defendant is not liable under CERCLA or RCRA, all claims and cross-claims against that party will be dismissed.

06 (D.N.H.1985) (holding that there is no requirement that plaintiffs show that defendant's waste caused environmental harm).

However, the plaintiff must establish some connection between the release or threatened release of the hazardous substance and the particular defendant's waste. The showing required, however, is minimal. It must merely "present evidence that a generator defendant's waste was shipped to a site and that hazardous substances similar to those contained in the defendant's waste remained present at the time of release." *United States v. Monsanto*, 858 F.2d 160, 169 n. 15 (4th Cir.1988) *cert. denied* 490 U.S. 1106, 109 S.Ct. 3156, 104 L.Ed.2d 1019 (1989). *See also United States v. Alcan Aluminum Corp.*, 964 F.2d 252, 266 (3d Cir.1992) (plaintiff-government "must simply prove that the defendant's hazardous substances were deposited at the site from which there was a release and that the release caused the incurrence of response costs"); *Violet v. Picillo*, 648 F.Supp. 1283, 1292 (D.R.I.1986) ("CERCLA only requires that the plaintiff prove by a preponderance of the evidence that the defendant deposited his hazardous waste at the site and that the hazardous substances contained in the defendant's waste are also found at the site."); *United States v. Wade*, 577 F.Supp. 1326, 1333 (E.D.Penn.1983) ("The only required nexus between the defendant and the site is that the defendant have dumped his waste there and that the hazardous substances found in the defendant's waste are also found at the site.").

In addition to its CERCLA claims, Acme also asserts RCRA claims against all of the "fast-track" defendants pursuant to 42 U.S.C. § 6972(a)(1)(B). As discussed above, this "citizen suit" provision of RCRA authorizes a lawsuit where a plaintiff can show (1) that conditions at a site may present an imminent and substantial endangerment, (2) that the endangerment stems from the past of present handling, treatment, storage or disposal of solid or hazardous waste, and (3) that the defendant contributed to such handling, treatment, storage or disposal of the solid or hazardous waste. *See Bliss*, 667 F.Supp. at 1313; *United States v. Conservation Chemical Co.*, 619 F.Supp. 162, 199–200

(W.D.Mo.1985). Although the Court has already concluded that the question of whether the Fadrowski site poses an imminent and substantial danger is a question for the trier of fact, a "fast-track" defendant may still be entitled to summary judgment if it can show that Acme cannot meet one of the other requirements to maintain its cause of action. For the purposes of these motions, the only issue before the Court will be whether the defendant has contributed to the handling, treatment, storage or disposal of some solid or hazardous waste at the Fadrowski site. This inquiry will be similar to the CERCLA inquiry in that Acme must be able to show that a particular defendant's waste was disposed of at the site. However, it will differ from the CERCLA inquiry to the extent that Acme *will not* be required to·show that the wastes involved were hazardous. For the purposes of RCRA, disposal of *nonhazardous solid wastes* which contribute to an imminent and substantial endangerment can still result in liability. *See* 42 U.S.C. § 6972(a)(1)(B).

It is worth noting that the initial burden of production in these summary judgment motions lies with the defendants. Once they satisfy their initial burden, the burden then shifts to the nonmovant plaintiff to show that a genuine issue of material fact exists. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). According to the Supreme Court:

If the defendant in a run-of-the-mill civil case moves for summary judgment ... based on the lack of proof of a material fact, the judge must ask himself not whether he thinks the evidence unmistakably favors one side or the other but whether a fair-minded jury could return a verdict for the plaintiff on the evidence presented. *The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff.*

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986) (emphasis added). *See also Lawshe v. Simpson*, 16 F.3d 1475, 1477 (7th Cir.1994). Moreover, the Supreme Court has also stated that:

[T]he plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against the party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.

*Celotex,* 477 U.S. at 322, 106 S.Ct. at 2552.

The Court will address each "fast-track" defendant separately.

### 1. Bel–Aire Enterprises

Bel–Aire Enterprises, Concrete Contractors, Inc. ("Bel–Aire") is a paving contractor owned and operated by Dennis Ewald. *Deposition of Dennis Ewald* (June 13, 1990) at 6–8. The company removes and paves driveways, sidewalks and streets for private residences and municipalities in the Milwaukee area. *Affidavit of Dennis Ewald* at ¶ 2. In the mid–1970s, Bel–Aire began disposing waste material at the Fadrowski site under a long-term oral agreement with Mr. Fadrowski. When Fadrowski sold the site to Menard, the sale was made contingent on continuing the arrangement with Bel–Aire for five years. Plaintiff's Exhibits 43, 44.

Acme first alleges that Bel–Aire should be held liable as a generator of hazardous waste which was ultimately disposed of at the Fadrowski site. It is undisputed that Bel–Aire disposed of solid waste at the Fadrowski site. However, Bel–Aire moves the Court for summary judgment on the basis that Acme has offered insufficient proof that the waste disposed of by Bel–Aire contained hazardous substances. Bel–Aire contends that it only disposed of nonhazardous solid waste at the site such as concrete, rocks, sod, and sand. Acme, in contrast, claims that asphalt—which contains hazardous substances—was mixed in Bel–Aire's waste.

In support of its motion, Bel–Aire points to the following deposition testimony of Anthony Ivancich, Fadrowski's driver:

Q [D]id you ever see anyone from Bel–Aire dump anything at the South 27th Street site besides concrete, dirt or the like?

A I was pretty close with Bel–Aire Enterprise, and the only thing that they dumped was concrete or ground, and that is all. . . .

*Deposition of Anthony Ivancich,* (March 8, 1990) at 125. Bel–Aire also points to the deposition testimony of Dennis Ewald to the effect that Bel–Aire never removed asphalt paving. *Ewald Deposition* (June 13, 1990) at 10–12.

In opposition to Bel–Aire's motion, Acme relies on the inference that, because the site contained large amounts of asphalt intermixed with broken concrete, and because Bel–Aire was engaged in the paving business, that asphalt must have been disposed of at the site by Bel–Aire. *See Affidavit of Robert E. Pearson* ("Pearson Affidavit") at ¶¶ 3–5; *Ivancich Deposition* (March 9, 1990) at 192. The Court concludes that Acme has failed to sufficiently respond to Bel–Aire's evidence that the wastes it disposed of were nonhazardous. Even viewing the evidence in a light most favorable to Acme, this is simply not enough to survive a summary judgment motion.

Acme further contends that Bel–Aire should be held liable as an owner/operator of the Fadrowski site based on the special arrangement that existed between Bel–Aire and Fadrowski. It argues that the long-term agreement between Bel–Aire and Fadrowski was the equivalent of a lease and that thus, Bel–Aire had a legal interest in the site and can therefore be held liable as an owner/operator pursuant to § 9607(a). *See International Clinical Laboratories, Inc. v. Stevens,* 20 ELR 20560, 1990 WL 43971 (E.D.N.Y. 1990); *United States v. South Carolina Recycling and Disposal, Inc.,* 653 F.Supp. 984 (D.S.C.1984), *aff'd in part, vacated in part sub nom,* 858 F.2d 160 (4th Cir.1988), *cert. denied,* 490 U.S. 1106, 109 S.Ct. 3156, 104 L.Ed.2d 1019 (1989).

CERCLA itself provides little guidance as to who is to be considered an owner/operator for purposes of the statute. It defines "owner or operator" as "any person owning or operating" a hazardous waste facility, 42 U.S.C. § 9601(20)(A), which is, as the Ninth Circuit has observed, "a bit like defining

'green' as 'green.'" *Long Beach Unified School District v. Dorothy B. Godwin California Living Trust*, 32 F.3d 1364, 1368 (9th Cir.1994). However, we are counselled to interpret the circularity of the statutory definition as a command to employ the ordinary meaning of the word rather than an unusual or technical meaning. *Edward Hines Lumber Co. v. Vulcan Materials Co.*, 861 F.2d 155, 156 (7th Cir.1988).

Acme has not alleged sufficient facts to support a finding that Bel–Aire had in fact assumed a sufficient legal relationship to be held liable as an owner of the Fadrowski site. It is undisputed that Bel–Aire was not a formal leaseholder. Acme points to the fact that the relationship between Fadrowski and Bel–Aire was a long-term arrangement and that Bel–Aire's right to continue disposal operations at the site was incorporated as a limiting condition to Fadrowski's sale of the site to Menard in 1983. *See Deposition of Marv Proschaska* (January 30, 1990) at 23–26. Nonetheless, ownership of a leasehold interest in property is not the same thing as having a long-term agreement to use it. To have a lease, the tenant must have a present possessory interest in the land. There is no evidence that Bel–Aire ever had any right of possession in the Fadrowski site.

Bel–Aire clearly did have a right to use the land for a specific purpose; namely, dumping its solid waste. If this arrangement is anything more than a contract to use the land, it is an easement rather than a lease. An easement holder is generally not burdened with the obligations of ownership. *See Cassidy v. Department of Natural Resources*, 132 Wis.2d 153, 390 N.W.2d 81, 86 (Wis.Ct. of App.1986) ("Holders of easements gain no ownership interest in the underlying land, for an easement 'is not an estate in land, but rather a right to use the land of another ...'") (*quoting Hunter v. McDonald*, 78 Wis.2d 338, 344, 254 N.W.2d 282, 285 (1977)). Therefore, since Bel–Aire is not an owner of the site, this cannot provide a basis for liability. *See Long Beach Unified*, 32 F.3d at 1368–69 ("[W]e see no basis for holding that easement holders are owners for purposes of CERCLA liability.").

Acme further contends that Bel–Aire should be held liable as the operator of the Fadrowski site. In order to be an operator under CERCLA, a party must exercise some kind of day-to-day control over operations at the site. *See Edward Hines*, 861 F.2d at 157; *Long Beach Unified School District*, 32 F.3d at 1367 ("To be an operator of a hazardous waste facility, a party must do more than stand by and fail to prevent contamination. It must play an active role in running the facility, typically involving hands-on, day-to-day participation in the facility's management."). Acme contends that because Bel–Aire was obligated to level, grade, and "backfill" the materials it dumped at the Fadrowski site, it effectively operated the site.

There is simply no evidence that Bel–Aire played any role in the day-to-day operation and management of the Fadrowski site. In fact, there is absolutely no evidence that anyone other than Ed Fadrowski called all of the shots with respect to the operation of his landfill. Acme asks the Court to extend what one would ordinarily consider the operation of a site beyond the dictates of common sense. Accordingly, the Court finds that Bel–Aire cannot be liable as the operator of the site.

Finally, Acme alleges that Bel–Aire is liable under RCRA, 42 U.S.C. § 6972(a)(1)(B). As discussed above, in order to maintain a cause of action under this provision, Acme must be able to show that Bel–Aire has contributed to the handling, storage, treatment, transportation and disposal of the solid or hazardous waste, which has created an imminent and substantial danger to health or the environment. *Bliss*, 667 F.Supp. at 1313. In support of its summary judgment motion, Bel–Aire contends that Acme cannot prove that it contributed to the handling of hazardous waste that it is therefore entitled to summary judgment.

Bel–Aire may have contributed to the problems at the site by dumping its waste at the site and spreading and mixing its wastes about during its "backfilling" and "levelling off" operations. *See Tanglewood East Homeowners v. Charles–Thomas, Inc.*, 849 F.2d 1568, 1574 (5th Cir.1988). Moreover, it

is undisputed that Bel–Aire did dispose of *solid waste* at the site. Therefore, the Court concludes that there is a genuine dispute of fact as to whether these activities contributed to any hazard that may exist at the site.

Accordingly, because we find that Bel–Aire was neither a generator of hazardous waste or an owner/operator of the Fadrowski site, its motion for summary judgment on Acme's CERCLA claims will be granted. Acme's corresponding summary judgment motion seeking a declaration of CERCLA liability is therefore denied. However, because triable issues remain, Bel–Aire's motion for summary judgment on Acme's RCRA claims will be denied.

## 2. Cambridge Chemical

■■■ Cambridge Chemical, Inc. ("Cambridge") is a Wisconsin corporation that has been doing business in Milwaukee since 1978. It is engaged in the business of small scale custom synthesis research and development services specializing in the synthesis of organic materials in small quantities. *Affidavit of James M. Pykett* at ¶ 3. Cambridge contracted with Ed's Trucking on four different occasions to haul rubbish in 1978 and 1979. According to James Pykett, a vice-president of Cambridge, this rubbish consisted of "office, lunchroom and bathroom trash; paper towels; plastic bags; clear broken glass; bottles; lab glassware; boxes; crating material; poly packaging beads and vermiculite; flattened cans; cleaned five gallon poly containers; possibly a few empty clean metal cans; scraps of carpeting; floor vinyl; wood; paneling; and tile." *Pykett Affidavit* at ¶ 6. Cambridge contends that much of this waste was generated during a remodeling project and that none of the waste was hazardous.

In support of its summary judgment motion, Cambridge argues that Acme cannot prove that any of its waste was ever disposed of at the Fadrowski site. It points to the following circumstantial evidence that its waste was not disposed of at the Fadrowski site, but rather was taken by Ed's Trucking to the Milwaukee County Landfill or the Nype Landfill. First, the available Cambridge invoices from Ed's Trucking indicate that Ed's picked up only rubbish from the

company. In addition, Cambridge points to the deposition testimony of Ed Fadrowski that only solid waste was disposed of at the Fadrowski site, whereas rubbish was taken either to the County Landfill or the Nype Landfill. *See Fadrowski Deposition* (August 24, 1984) at 34–35, 87–88. Fadrowski's driver, Tony Ivancich, confirmed that this was the practice. *Ivancich Deposition* (February 19, 1985) at 24. Although Ivancich testified that on several occasions, he departed from this policy and did dump rubbish loads at the Fadrowski site, these dumpings took place between 1973 and 1976, before Cambridge ever began employing the services of Ed's Trucking. *See Ivancich Deposition* (February 19, 1985) at 25. Finally, although Ivancich does not clearly remember picking up waste from Cambridge, he did testify that:

> If I did haul for them, which I did, if they are marked down here, it very possible [sic] was chemicals. And that went on the rubbish truck, because that's the only truck I could get into that little dock that they had there. That's the only thing I can recall. I think I pulled—I went—I hauled for them two times and there wasn't that much there and that was on a rubbish truck that went to the County.

*Ivancich Deposition* (February 2, 1990) at 79. Based on this evidence, the Court concludes that Cambridge meets its initial burden to support its motion for summary judgment.

In response, Acme argues that Cambridge waste must have been disposed of at the Fadrowski site because (1) Ed's Trucking was the only company that picked up waste from Cambridge between 1978 and 1980, *Pykett Deposition* at pp. 102–107, (2) Cambridge has no record of any disposal of its drummed chemical waste by anyone other than Ed's until 1981, *Pykett Deposition* at pp. 107–109, and (3) that pollutants contained in Cambridge's waste stream are consistent with the hazardous substances found at the site, *Radcliffe Affidavit* at ¶ 19(f). Therefore, Acme argues, it is reasonable to infer that Cambridge's hazardous waste must have been disposed of at the Fadrowski site.

The Court concludes that Acme has not introduced sufficient evidence to rebut Cam-

bridge's affirmative evidence that its waste was disposed of elsewhere. It is not enough to simply argue that Cambridge "must have" disposed of waste at the Fadrowski site in the face of strong circumstantial evidence that Cambridge's waste was in fact disposed of at the County Landfill. Because there is no triable issue as to whether any of Cambridge's waste was disposed of at the Fadrowski site, Cambridge cannot be liable under RCRA or CERCLA. Therefore, the Court will grant Cambridge's motion for summary judgment.

### 3. Cardinal Fabricating

■ Cardinal Fabricating Corporation ("Cardinal") is in the business of fabricating structural steel beams and columns for the construction industry. According to a co-owner of Cardinal, its basic operation involves cutting the beams to the length requested by customers, smoothing them out with a wire brush, and spray painting the beams with a primer. *Deposition of Bruce Schlosser* (June 21, 1990) at 9–27. The primers used by Cardinal contained several hazardous substances, including toluene, xylene and VM & P Naptha. *Schlosser Deposition* at 33–43. Schlosser testified that the residual paint from the spray painting operation was placed in 55 gallon drums and was disposed of by Cardinal's rubbish hauler; from 1971 to 1977, Ed's Trucking. *Schlosser Deposition* at 13, 15. Cardinal also used a thinner in its processes which contained a hazardous substance. The thinner was either left to evaporate or was picked up by its paint supplier. *Schlosser Deposition* at 13–19.

Cardinal now moves the Court for an order granting summary judgment based on the fact that Acme can point to no evidence that Cardinal's waste was ever disposed of at the Fadrowski site. Therefore, argues Cardinal, the company neither arranged for the disposal of hazardous waste at the facility nor contributed to any imminent and substantial endangerment that might exist at the site.[6]

---

6. Cardinal concedes, for the purposes of this motion only, that its waste contained hazardous

In support of its summary judgment motion, Cardinal relies on the fact that it only hired Ed's Trucking to dispose of rubbish and that Ed's practice was to dispose of rubbish at the County landfill or the Nype Landfill. *See* § III.B.2., *supra*. It also points to the following deposition testimony of Tony Ivancich:

Q Now, another company you picked up from was Cardinal Fabricating, is that right?

A Yes.

Q Was that a rubbish pick up or—

A It was rubbish.

*Ivancich Deposition* (February 2, 1990) at 52.

In response to Cardinal's motion, Acme relies on the fact that Cardinal's waste could have been included in the partial rubbish loads that Ivancich dumped at the Fadrowski site, *see Ivancich Deposition* (February 2, 1990) at 100, and the fact that wastes consistent with the types of waste generated by Cardinal were found at the site. *See Affidavit of Michael J. Radcliffe* at ¶¶ 11–16; *Schlosser Deposition* at 33–43. From this, Acme argues that despite the fact that there is no direct evidence of Cardinal's waste being dumped at the Fadrowski site, it is reasonable to conclude that Cardinal's waste was in fact disposed of there.

For the same reasons discussed in conjunction with Cambridge Chemical, *supra*, the Court concludes that Acme's argument amounts to little more than speculation, and is insufficient to survive Cardinal's summary judgment motion dismissing all CERCLA and RCRA claims against it. Accordingly, the Court will grant Cardinal's motion.

### 4. Commercial Heat Treating

■ Commercial Heat Treating, Inc. ("Commercial") hired Ed's Trucking to dispose of waste left by the prior owner of a property Commercial had acquired. Commercial's waste included foundry sand, wood pallets, wood patterns and wood shipping crates. *Affidavit of Lloyd L. Stepien* at ¶ 4;

---

substances. *Cardinal Brief* at p. 4.

*Answer to Interrogatory No. 2 of Response of Commercial Heat Treating, Inc. to Plaintiff's Interrogatories and Request for Documents.* This waste was considered by Ed's Trucking to be solid fill and was thus disposed of at the Fadrowski site. *Ivancich Deposition* (February 2, 1990) at 13–14. Commercial has moved the Court for summary judgment based on the fact that none of the waste it disposed of through Ed's Trucking was hazardous.

Prior to considering Commercial's motion for summary judgment, the Court must determine whether to consider additional evidence submitted by Commercial in support of its motion. The Court concludes that the discovery of this new evidence constitutes sufficient cause for extending the time period for filing additional affidavits pursuant to Fed.R.Civ.Proc. 6(b). It further concludes that it is in the interest of justice to resolve this matter on the merits, considering all available evidence.

Therefore, the Court will grant Commercial's request to supplement the record and will deny Acme's corresponding motion to strike Commercial's supplementary submissions. Acme will be given 30 days from the date of this order to respond to this additional evidence; Commercial will be given 15 days after that to reply. Upon receipt of these supplemental briefs, the Court will decide both Commercial's summary judgment motion and Acme's cross-motion for summary judgment forthwith.

### 5. Hartwig Exhibitions

 Hartwig, Inc. ("Hartwig") is engaged in the business of making exhibits for trade shows. *Deposition of Daniel Hartwig* (June 20, 1990) at 7. As a part of its operations, the company uses paints, inks and thinners and produces waste consisting of "used lacquer thinner" which contains toluene, 2–propanone, and acetone—among the hazardous substances found at the Fadrowski site. Hartwig has moved the Court for summary judgment dismissing all claims against it on the basis that there is no evidence that it ever disposed of any hazardous substances at the Fadrowski site. Hartwig does not dispute that its waste was taken to the Fadrowski site; rather it contends that any waste it disposed of through Ed's Trucking was nonhazardous.

In support of its position, Hartwig claims that it occasionally employed Ed's Trucking to dispose of "used obsolete exhibits" which consisted of lumber, plywood, hardboard, plexiglas, steel an aluminum tubing, bolts, screws, hardware, electrical fixtures, wire, electrical fittings, carpeting and fabric. *See Hartwig's Answer to Plaintiff's Second Set of Interrogatories and Request for Production of Documents* at 2–3. Hartwig further points to the deposition testimony of Tony Ivancich, who testified as follows:

> These were large crates. They would put displays in the crates for exhibitions. I would haul them out. . . . I would have a . . . friend that wanted them. They would take the crates apart. Save the 1 × 2's, the plywood, the fluorescent lights inside there. I would stock them and they would come and rip them apart and take it and haul it off.

*Ivancich Deposition* (February 2, 1990) at 54–55. Finally, Hartwig submits the deposition testimony of Daniel Hartwig, the president of the company, in which he repeatedly and emphatically maintains that only obsolete exhibits were disposed of through Ed's Trucking. *See Hartwig Deposition,* at 99:8–9, 119:20–21, 166:6–15.

In response, Acme argues that it is reasonable to conclude that Ed's Trucking picked-up mixed loads of rubbish, exhibit material and barrels from Hartwig for disposal at the Fadrowski site, and that the barrels from Hartwig disposed of at the site contained Hartwig's toluene-based spent lacquer thinner, a hazardous waste. Acme points to the following evidence to support its position: (1) Hartwig generated approximately three barrels of lacquer thinner each year; (2) Hartwig has produced no records of who picked up its lacquer thinner between 1974 and 1976; (3) Ed's Trucking picked up several loads of waste during that period; (4) Hartwig had both its rubbish and used lacquer thinner picked-up at the same door of its facility; and (5) the pollutants and contaminants that would be found in Hartwig's waste

streams are consistent with the pollutants and contaminants at the Fadrowski site.

Similar to its arguments advanced in opposition to other defendants' summary judgment motions, Acme asks the Court to infer from these facts that because Hartwig generated some hazardous waste similar to those found at the site, and because Hartwig used Ed's Trucking on occasion, that Hartwig's hazardous waste must have been disposed of at the Fadrowski site. Acme contends that it is Hartwig's burden to prove that its hazardous waste did not find its way to the Fadrowski site. This is a misapplication of the standard. The burden shifts to the defendant only after the plaintiff establishes the elements of its case, including showing that the defendant disposed of hazardous waste at the site. Here, Acme has not established that there is a genuine issue of fact as to whether Hartwig disposed of hazardous waste at the Fadrowski site. Its attempt to prove its case through a somewhat tenuous chain of inferences is not sufficient to survive summary judgment, especially given the direct evidence presented by Hartwig that only nonhazardous wastes were disposed of through Ed's Trucking. Therefore, Hartwig's motion for summary judgment on Acme's CERCLA claims will be granted.

Moreover, it appears from the available evidence that the Fadrowski site was not the final resting place for Hartwig's waste. The old exhibits appear to have been dismantled and hauled away by friends of Ivancich. Acme has pointed to no evidence that would rebut this claim. Therefore, the Court also concludes that Hartwig could not have contributed to any imminent and substantial endangerment that might exist at the Fadrowski site. Thus, Hartwig's motion for summary judgment on Acme's RCRA claims will also be granted.

### 6. Helmut's Building Services

■ Helmut's Building Services, Inc. ("Helmut's") is engaged in the business of residential home improvements, including roofing, siding, and the removal and replacement of concrete stoops, sidewalks and patios. *Affidavit of Helmut Herrmann* at ¶ 2; *Deposition of Helmut Herrmann* (June 14, 1990) at 4. Helmut's employed the services of Ed's Trucking on numerous occasions between 1976 and 1980.[7]

In support of its summary judgment motion, Helmut's argues that it never arranged for the disposal of hazardous waste at the Fadrowski site. Although it does not dispute the fact that its wastes were disposed of at the Fadrowski site, Helmut's contends that it only used Ed's Trucking to dispose of nonhazardous wastes such as broken concrete, gravel, ground and dirt. *Herrmann Affidavit* at ¶ 6. It relies in part on the testimony of Tony Ivancich, who stated that he only picked up concrete and ground from Helmut's. *See Ivancich Deposition*, (February 2, 1990) at 10 ("It was mostly concrete and that's it."); *Ivancich Deposition* (March 8, 1990) at 117 ("Nothing but concrete and—busted up concrete or ground.") Finally, Helmut's relies on the fact that most of the available Ed's Trucking invoices describe the Helmut's loads in yards. According to Marcia Smith, Fadrowski's bookkeeper during the pertinent period, this indicates that concrete was picked up, because concrete was measured in yards. *Deposition of Marcia E. Smith* (February 1, 1990) at 62.

In response, Acme argues that Helmut's generated waste other than concrete during its home improvement operations, some of which must have contained hazardous substances such as paint and asphalt. It further argues that Helmut's cannot account for any other waste disposal arrangements it made during the relevant time period. Moreover, the types of contaminants that would be found in the type of hazardous waste generated by Helmut's were found at the Fadrowski site. *See Radcliffe Affidavit* at ¶¶ 12, 13. Therefore, argues Acme, it is reasonable to infer that Helmut's hazardous waste was in fact disposed of at the site.

■ For the same reasons discussed above, these "must have been" claims are

---

**7.** Acme contends that Helmut's employed Ed's on at least thirty (30) occasions. *See Plaintiff's Brief in Opposition to Fast Track Summary Judg-* *ment Motions* at 30. Helmut's contends that it employed Ed's on only thirteen (13) occasions. *Herrmann Affidavit* at ¶ 3.

simply not sufficient to survive a summary judgment motion in the face of direct evidence that only nonhazardous waste was disposed of at the site. Moreover, Helmut Herrmann testified that its painting and roofing work was subcontracted to other companies, and that therefore it never arranged for the disposal of paint or roofing materials which might have contained hazardous wastes. *Herrmann Deposition* (June 14, 1990) at 5, 10, 14. Therefore, Helmut's summary judgment motion will be granted with respect to Acme's CERCLA claim. However, because Helmut's does not contest the fact that its solid waste was disposed of at the Fadrowski site, the Court cannot conclude as a matter of law that it did not contribute to any imminent and substantial danger that may exist at the site. Therefore, Helmut's summary judgment on Acme's RCRA claim will be denied.

### 7. Lincoln Savings Bank

■ One aspect of Ed Fadrowski's business consisted of "house cleanouts," which he performed for, among others, Lincoln Savings Bank ("Lincoln"). These house cleanouts would be performed when Lincoln foreclosed on a mortgage and the mortgagor moved out of the house and left various debris behind. According to Ivancich, "it would consist of like if somebody moved out and they left the refrigerator and stove an a lot of rubbish in there. And we would clean it out and that would go to the County dump site." *Ivancich Deposition* (February 2, 1990) at 20. The exact contents of this rubbish is unknown; the materials probably included clothes, paint cans, canning jars, appliances, furniture, lumber, car parts, waste oil containers, solvents, thinners and pesticides. *Ivancich Deposition* (February 2, 1990) at 23–23. *See also Deposition of Robert Blonski* (January 31, 1990) at 11–17. Many of these items could have contained hazardous substances.

Lincoln bases its summary judgment motion on the fact that Acme has introduced insufficient evidence to support its burden of proving that Lincoln's waste was in fact disposed of at the Fadrowski site. In support of its motion, Lincoln first points to the deposition testimony of Ed Fadrowski, which explains the policy of disposing of "rubbish" at the County Landfill or Nype Landfill and solid fill only at the Fadrowski site. *Fadrowski Deposition* (August 24, 1984) at 34–35, 87–88. In addition, it introduces the following testimony of Tony Ivancich:

Q Is it safe to say that anything that was taken from Lincoln Savings Bank cleanups were taken only to County as you previously testified?

A Yes, sir.

Q And you're certain of that?

A Yes, sir.

*Ivancich Deposition* (March 8, 1990) at 113.

In opposition to Lincoln's summary judgment motion, Acme relies largely on the fact that Ivancich has admitted to dumping partial loads of rubbish at the Fadrowski site rather than at the County Landfill in accord with Ed's general policy. According to Ivancich, "I don't think I dumped more than four loads of rubbish [at the Fadrowski site] out of 14 years. So I don't think I'm doing that bad." *Ivancich Deposition* (February 2, 1990) at 100. Ivancich further testified that he did not know who's rubbish was disposed of at the Fadrowski site on these occasions. *Ivancich Deposition* (February 2, 1990) at 106. However, Ivancich testified that he did *not* dump materials from the house cleanouts at the Fadrowski site: "I know for a fact I did not with realty companies or anything like that. Say I would get a small job. Say somebody called me or if you called me. You did a remodeling job. And maybe I had about two, three yards of 2 × 4's. Maybe plaster or something like that. I think I said, I know for a fact I have dumped on the [Fadrowski] dump site. And that's probably what I dumped." *Ivancich Deposition* (February 2, 1990) at 28.

Acme relies on this, plus the fact that hazardous substances consistent with the types of hazardous waste found in Lincoln's waste stream was found at the Fadrowski site, *Radcliffe Affidavit* at ¶ 5, to support the conclusion that Lincoln's waste must have been disposed of at the Fadrowski site.

While Acme's evidence is somewhat stronger in this case than in its opposition to

some of the other "fast-track" summary judgment motions, the Court concludes that it is still not enough to survive summary judgment. The Court is required to make all *reasonable* inferences in favor of Acme, the nonmovant. However, the inference Acme asks the Court to make is not reasonable. The fact that several partial loads of rubbish, the source of which is unknown, were disposed of at the Fadrowski site and that relatively common wastes, which *could* resemble the wastes Lincoln *might* have dumped through Ed's Trucking is simply not enough evidence to support a conclusion that Lincoln's waste was dumped at the Fadrowski site. The Court concludes that no reasonable jury could conclude that it was. Therefore, it will grant Lincoln's summary judgment motion on both Acme's CERCLA and RCRA claims.

### 8. Lubricants Inc.

From 1971 to 1983, Lubricants operated a waste oil reclamation facility at 1900 South 73rd Street in West Allis, Wisconsin. *Deposition of Richard Drexler*, (June 12, 1990) at 11. Lubricants obtained its waste oil from various filling stations in the Milwaukee area and from a number of industrial concerns, including Briggs & Stratton, Carnation Company, Giddings & Lewis, RTE Corp., Waukesha Engines, Lindberg Heat Treating, and Red Rock Plastics. *See Deposition of Robert Howell* (June 21, 1990) at 18–20, 43–44, 52–58, 68–70.

During its reclamation process, Lubricants generated three types of waste: acid sludge, spent clay and quenching water. Plaintiff's Exhibit 268. These wastes contained hazardous substances which are consistent with the pollutants and contaminants found at the Fadrowski site. *Radcliffe Affidavit* at ¶ 19(e). It is undisputed that the hazardous waste generated by Lubricants was disposed of at the Fadrowski site. According to Tony Ivancich:

Q Now, once the [Lubricants'] sludge was disposed of it solidified; is that right?

A You mean if I mixed it with ground it would be a solid item?

Q Right. Right.

A. Yes, sir. Right.

Q And on some occasions did you mix it with ground?

A It had to be. It had to be.

Q It had to be mixed with ground?

A Yeah.

Q And did you mix it with ground at the landfill on South 27th Street?

A Yes, sir. Yeah.

*Ivancich Deposition* (February 2, 1990) at 14–15. In addition, Ivancich identified a black liquid sludge portrayed in pictures taken by the DNR as Lubricants' waste. *Ivancich Deposition* (February 2, 1990) at 64–65, 72–73, 75, 77–78, 87; Plaintiff's Exhibits 138, 141, 143, and 149.

Lubricants is a named defendant in this action, but despite service upon its registered agent, it has never appeared in this action. *Affidavit of Ted Warpinski*, ¶ D. In the matter currently before the Court, two persons associated with Lubricants—Richard Drexler and Robert Howell—move for summary judgment on Acme's claims against them personally.

#### a. Richard Drexler

During Lubricants' period of operation, Richard Drexler was its president and a major shareholder.[8] *Drexler Deposition* (June 12, 1990) at 9–10. On April 9, 1982, Drexler filed for Chapter 7 bankruptcy on behalf of Lubricants, Inc. *Drexler Deposition* (June 12, 1990) at 60–61; Plaintiff's Exhibits 278, 334. The estate was closed out on January 31, 1983. Plaintiff's Exhibits 323, 334. On March 11, 1983, Drexler filed for personal bankruptcy under Chapter 7. *Drexler Deposition* (June 22, 1990) at 44; Plaintiff's Exhibit 344. No claims for potential liabilities in connection with the Fadrowski site were scheduled in this proceeding. *Drexler Deposition* (June 22, 1990) at 44.

---

**8.** Between 1971 and 1980, Drexler was a 51% shareholder of Lubricants. In 1981, four investors purchased 80% of the company's shares (Drexler retained ownership over the remaining 20%), which they held until June of 1981, when the corporation re-purchased the shares and Drexler became the sole shareholder. *Drexler Deposition* (June 12, 1990) at 10–11.

■ The sole basis on which Drexler seeks summary judgment is that any liability he may have had in connection with the Fadrowski site was discharged by his Chapter 7 bankruptcy. However, Chapter 7 only discharges *prepetition* debts. 11 U.S.C. § 727(b). Drexler's liability will therefore be discharged only if he can establish that there is no dispute of fact as to whether Acme's claims arose before March 11, 1983. Acme argues that its CERCLA claims against Drexler did not arise until after Drexler filed his Chapter 7 petition.

CERCLA liability does not arise until each element of § 9607(a) is satisfied. *See Ascon Properties v. Mobil Oil Co.*, 866 F.2d 1149, 1152 (9th Cir.1989) (setting forth elements of CERCLA cause of action). This requires the plaintiff to show, *inter alia*, that there was a release or threatened release of a hazardous substance, and that response costs were incurred. Acme's first allegation of a release from the Fadrowski site is in June of 1983, several months after Drexler's bankruptcy petition was filed. In the absence of evidence that the release or threatened release occurred prior to the filing of the petition, "any subsequent liability for environmental cleanup or remedial action is not dischargeable in bankruptcy." *United States v. Chateaugay Corp.*, 112 B.R. 513, 31 ERC 1427, 1431 (S.D.N.Y.1990) *aff'd In Re Chateaugay Corp.*, 944 F.2d 997 (2d Cir.1991); *Jensen v. Bank of America*, 114 B.R. 700, 706–07 (E.D.Cal.1990). Moreover, no response costs were incurred until after the discovery of the release in June of 1983. Therefore plaintiff's CERCLA claims did not arise prepetition. *Jensen*, 114 B.R. at 703.

■ Similarly, a RCRA claim made pursuant to 42 U.S.C. § 6972(a)(1)(B) cannot not arise until all of its elements are satisfied. Liability under this provision does not attach unless there is an imminent and substantial danger to health or the environment. Again, Acme has not alleged any endangerment prior to the release that occurred in June, 1983, after Drexler filed his petition.

■ Therefore, the Court concludes that Drexler's liability arose after his bankruptcy petition and is therefore not discharged thereby. Accordingly, his motion for summary judgment will be denied. Because Acme has pointed to no evidence which would establish that Drexler had the authority to control the waste disposal practices of Lubricants or that he in fact undertook responsibility for its disposal practices, *see Kelley v. Thomas Solvent Co.*, 727 F.Supp. 1532 (W.D.Mich.1989), the Court will deny Acme's cross-motion for summary judgment as well.

### b. Robert Howell

Robert Howell is a chemist who was employed by Lubricants from 1973 through 1981. *Affidavit of Robert M. Howell* at ¶ 1. Howell worked primarily as a formulation chemist until approximately 1979 when he assumed greater operational responsibilities. *Howell Deposition* (June 21, 1990) at 11–12.

Acme has sued Howell as the person who arranged for the disposal of Lubricants' hazardous waste. Howell has moved for summary judgment on the basis that he cannot be held liable under either RCRA or CERCLA because he was only an employee of the company and did not have the authority to make the sorts of decisions that would subject him to personal liability.[9] *See Defendant Robert Howell's Brief in Support of Motion for Summary Judgment* at 4–7.

■ In order to subject an individual to liability under CERCLA or RCRA, the Court must find that he or she (1) had the authority to control, and (2) in fact undertook responsibility for waste disposal procedures. *Kelley v. Thomas Solvent Co.*, 727 F.Supp. 1532, 1562 (W.D.Mich.1989) ("[W]here CERCLA seeks to impose liability beyond the corporate form, an individual's power to control the practice and policy of the corporation, and the responsibility undertaken by that individual in this area should be considered."). *See also United States v. Ward*, 618 F.Supp. 884, 894 (D.N.C.1985) ("A corporate

---

9. The Court uses the same analysis in reviewing the plaintiff's CERCLA claims and its RCRA claims. *See U.S. v. Northeastern Pharmaceutical & Chemical Co.*, 810 F.2d 726, 745 (8th Cir.1986)

("[Our] analysis of the scope of personal liability under the RCRA is similar to our analysis of the scope of individual liability under CERCLA.").

officer ... who exercises authority for the company's operations and participates in arranging for the disposal of hazardous wastes is liable under § 107(a)(3) for clean up costs.").

■ In support of his summary judgment motion, Howell argues that he neither had the authority to control, nor actually undertook responsibility for, Lubricants' waste disposal. He points to the following evidence in support of this contention. First, Howell was never a director or shareholder of Lubricants. Moreover, he does not consider himself an officer of the corporation, although he is listed as a vice president in Lubricants 1981 Annual Report.[10] Howell claims that he had limited authority to make decisions at the company: "I was not a shareholder or a real decision maker as such." *Howell Deposition* (June 21, 1990) at 7. In describing his relationship with Richard Drexler, the president of the company, Howell said: "He was the owner and I worked for him. There was no relationship." *Howell Deposition* (June 21, 1990) at 14.

Second, Howell contends that he did not make the decision regarding who would dispose of Lubricants' waste or where the waste would be disposed. He claims that Lubricants had contracted with Ed's Trucking to haul Lubricants' waste before Howell even began his employment with Lubricants. *Howell Deposition* (June 21, 1990) at 35. In fact, the contract with Ed's was inherited from the previous owner of Lubricants, Milton Warden. *Drexler Deposition* (June 12, 1990) at 35.

Acme disputes this characterization of Howell's role in the corporation and his control over the company's waste disposal procedures. It points to the testimony of Richard Drexler that Howell took "an active part in the decision-making of the corporation." *Drexler Deposition* (June 27, 1990) at 49. Furthermore, in response to a question about Mr. Howell's duties at Lubricants during the late 1970s, Drexler testified that:

His responsibilities were to maintain quality control, to develop through products,

through blend studies, to test for certain waste materials when acquiring a new account.... To manage the plant and to maintain proper records of EPA, DNR, any other regulatory agencies that were in effect at that time.

*Drexler Deposition* (June 27, 1990) at 49. From this testimony, Acme argues that based on his duties as plant manager and regulatory record-keeper, it is reasonable to conclude that Howell arranged for the disposal of hazardous waste and is therefore individually liable.

The Court concludes that Acme has not sufficiently supported its allegations to survive summary judgment in light of the evidence presented by Mr. Howell. While Howell may have played some role in the disposal of Lubricants' waste, Acme has pointed to no evidence that suggests he had the sort of authority and control over the waste disposal required for the imposition of liability. The Court agrees with the *Thomas Solvent* Court, which stated that "[i]mposing liability on a corporate individual is a serious matter.... Not all employees or managers of a close corporation will necessarily, absent special factors, be liable." *Thomas Solvent*, 727 F.Supp. at 1544. In fact, as far as this Court is aware, no court has ever imposed personal CERCLA or RCRA liability on an individual employee who did not either have an *ownership interest* in the company or *personally* arrange for the disposal of the hazardous waste. *See United States v. Northeastern Pharmaceutical & Chemical Co.*, 810 F.2d 726 (8th Cir.1986); *State of New York v. Shore Realty Corp.*, 759 F.2d 1032 (2d Cir.1985); *United States v. Conservation Chemical Co.*, 619 F.Supp. 162 (W.D.Mo.1985); *Bliss*, 667 F.Supp. at 1306; *Ward*, 618 F.Supp. at 890. Neither these, nor any other special factors are present here. Howell appears to have been an ordinary, if relatively senior, employee of Lubricants with limited duties and responsibilities. Accordingly, Howell's motion for summary judgment will be granted and Acme's corresponding motion for summary judgment will be denied.

---

10. Howell contends that this was "strictly a title." The title "was given to me to put on a calling card essentially." *Howell Deposition* (June 21, 1990) at 7.

## 9. Pemper Engineering Co., Inc.

Pemper Engineering Co., Inc. ("Pemper") is engaged in the business of repairing machinery for local foundries and print shops. *Deposition of James J. Pemper* (June 14, 1990) at 5. During the course of its operations, Pemper generated a variety of wastes, including various waste oils, metal turnings, metal chips, and metal slag. *Pemper Deposition* (June 14, 1990) at 13–15, 23, 44–49. The pollutants and contaminants found in these wastes are consistent with the pollutants and contaminants found at the site. *See Radcliffe Affidavit* ¶ 19(b). Pemper hired Ed's Trucking on approximately 14 occasions between 1979 and 1981, Plaintiff's Exhibit 117, for the purpose of disposing of construction debris generated during the company's renovation and moving process. *Pemper Deposition* (June 14, 1990) at 27–30.

Acme alleges that Pemper is liable under CERCLA and RCRA based on (1) its disposal of various wastes through Ed's Trucking and (2) the fact that it disposed of its used waste oil through Lubricants, Inc., which in turn disposed of contaminated waste at the Fadrowski site.[11]

 Pemper's argument in support of its summary judgment motion on Acme's first allegation is similar to that advanced by Cambridge Chemical, Lincoln Savings and other "fast-track" defendants: that Acme cannot establish a triable issue as to whether Pemper's waste was ever disposed of at the Fadrowski site. In addition to pointing to evidence that Ed's hauled rubbish for Pemper, *Ivancich Deposition* (February 2, 1990) at 89–90, and that it was the general practice of Ed's to dump rubbish at the County Landfill or Nype Landfill and solid waste at the Fadrowski site, *see* § III.B.2, *supra*, Pemper points to the testimony · of Tony Ivancich regarding his hauling activities for Pemper, affirmative evidence that Pemper's waste went to the County Landfill:

Q Do you recall Pemper Engineering now?

A I hope I got the right company, I'll tell you that.

Q Do you recall a company on Pierce Street?

A Yes, I do.

·Q Do you remember what you hauled out of there?

A It was rubbish.

Q Where did you take it?

A County dump site.

Q Any chance you took it anywhere else?

A No unless it was either—they didn't have any foundry sand.

Q Right. We already cleared—they were not foundry, correct?

A Right, I know. It went to County.

*Ivancich Deposition* (March 8, 1990) at 115–116.

Acme again relies on the same inferential argument it set forth previously: (1) because on a few occasions Ivancich departed from Ed's policy and did dump partial rubbish loads at the Fadrowski site, and (2) because waste consistent with the type of waste that would be found in Pemper's waste stream was found at the site, it is therefore reasonable to infer that Pemper's waste was in fact disposed of at the Fadrowski site.

As we discussed above, this inferential chain is simply too weak to defeat a summary judgment motion, especially in light of Pemper's affirmative evidence that its waste was disposed of elsewhere. Pemper's position is further bolstered by the fact that Ivancich testified that his rogue dumping took place between 1973 and 1976, *Ivancich Deposition* (February 19, 1985) at 25, before Pemper ever began employing the services of Ed's Trucking. *See Plaintiff's Brief in Opposition to "Fast–Track" Summary Judgment Motions* at 90 (Pemper used Ed's Trucking to haul waste in 1979, 1980 and 1981). The Court concludes that Acme has failed to rebut the affirmative evidence introduced by Pemper and that there is, therefore, no genuine dispute of fact as to whether Pemper's waste was disposed of at the Fadrowski site.

---

**11.** Because Pemper has not briefed the issue, the Court assumes, for the purpose of this motion, that its waste oil does *not* fall within CERCLA's petroleum exclusion.

Acme further alleges that Pemper is liable to it under CERCLA and RCRA because Pemper's waste oil was disposed of at the Fadrowski site via Lubricants until 1979. As discussed in § III.B.8, *supra,* it is undisputed that Lubricants' hazardous waste was disposed of at the Fadrowski site. Acme argues that it is therefore reasonable to conclude that Pemper's waste oil also contributed to the Lubricants' sludge that was disposed of at the site. *Plaintiff's Brief in Opposition to "Fast–Track" Summary Judgment Motions* at 45.

In support of its position, Acme relies on Pemper's answer to an interrogatory, in which Pemper described in general terms the process by which it disposed of waste oil. It admitted to disposing of waste oil through 1979 through a company called Warden's Oil, a predecessor to Lubricants, Inc. *See Defendant, Pemper Engineering Co., Inc.'s Answers and Objections to Interrogatories and Request for Production of Documents Propounded by Plaintiff, Acme Printing Ink Co.* at ¶ 3. Acme further relies on the following deposition testimony of James Pemper:

Q In about the third line down, [the interrogatory answer] reads, "Under both companies, Warden's and Lubricants, the transporter would arrive with a truck, and collect 55–gallon drums of waste oil." Do you see that?

A Um-hum.

Q Is that statement accurate?

A Yes.

　　*　　*　　*　　*　　*　　*

Q Then a couple of lines down from there, the document reads, "The aforementioned arrangement for disposal of waste oil continued until on or about 1979."

A Correct.

Q Is that statement correct?

A Um-hum, yes.

*Pemper Deposition* (June 14, 1990) at 17.

In an attempt to explain the interrogatory answer, James Pemper admitted to recalling only disposing of Pemper's waste oil through Warden's Oil, not through Lubricants:

Q But you do remember that Pemper Engineering gave its waste oil to Lubricants, Inc.; is that correct?

A No. I remember Warden's.

Q You don't remember Lubricants?

A No, because around that particular time, the practice of taking the oil as a service to help the war effort. . . .

*Pemper Deposition* (June 14, 1990) at 16. Pemper apparently has no specific memory of whether waste oil was disposed of through Lubricants. He does not believe it was, because Pemper generated small quantities and Lubricants would only pick up 55 gallon drums. *Pemper Deposition* (June 14, 1990) at 16–18. Pemper also relies on an affidavit submitted by Richard Drexler, the president of Lubricants, to the effect that he was familiar with Lubricants' customers and had never heard of Pemper. *Affidavit of Richard Drexler in Support of Pemper Engineering Company Inc.'s Motion for Summary Judgment* at ¶¶ 2–5.

The Court concludes that Acme has established a genuine dispute of material fact as to whether Pemper's waste oil was disposed of at the Fadrowski site via Lubricants. A reasonable jury certainly could choose to hold Lubricants to its interrogatory answer. Therefore, Pemper's motion for summary judgment on Acme's CERCLA and RCRA claims will be denied on this basis.

### 10. Service Painting Corporation

Service Painting Corporation ("Service Painting") is a painting contractor which operated out of 1966 South First Street since 1970. *Warpinski Affidavit,* ¶ D, Appdx. III, Tab 2. The company used Ed's Trucking to dispose of its waste materials on approximately 66 occasions between 1974 and 1982. *Defendant Service Painting, Inc.'s Response to Plaintiff's First Request for Production of Documents;* Plaintiff's Exhibits 113A, 117, 120. Service Painting used Ed's Trucking to haul sand blasting sand and paint barrels for disposal. *Ivancich Deposition* (February 2, 1990) at 35.

Service Painting moves the Court for summary judgment on the grounds that there is no evidence that its hazardous wastes were

disposed of at the Fadrowski site. It contends that only its nonhazardous sand was disposed of at the site, whereas its potentially hazardous paint barrels were disposed of at the County Landfill.

Service Painting points to the following testimony of Tony Ivancich in support of its position:

Q Did you ever pick up any wastes [at Service Painting]?

A Yes, I did.

Q What kind of materials?

A All that is sand. That's all. It's a solid landfill.

Q Did you ever pick up any barrels of dry paint there?

A No.

Q Where did you haul the materials from Service Painting Corporation?

A Okay. I would take it out to the [Fadrowski] dump site.

*Ivancich Deposition* (February 15, 1985) at 52. Ivancich later testified that he did in fact pick up paint barrels from Service Painting: "[I]t was dried up paint in the barrels. That went to County. The same as the little cans. They had small, okay, like if you paint your house. Get a little one-gallon or something like that. I hauled a lot of that. That went to the dump site, County dump." *Ivancich Deposition* (February 2, 1990) at 16. Ed Fadrowski's deposition testimony confirms that Service Painting's paint-related waste went to the County Landfill. *Fadrowski Deposition* (August 21, 1984) at 83. Finally, Service Painting points to the following Ivancich testimony: "I would have to say 98 percent [of Service's waste] was sand. Once in a while ... I would have some empty cans of paint, and that would go on a separate truck that would go out to the County dump site." *Ivancich Deposition* (March 8, 1990) at 121.

In response, Acme asserts that it is reasonable to conclude that on at least one occasion Ivancich picked up a mixed load from Service Painting containing both paint cans and sand blasting sand. Acme further asserts that this mixed load was probably dumped at the Fadrowski site. While this conclusion is not unreasonable, when Ivancich's testimony is examined in full, it is clear that this inference fails:

Q Now at least according to this work order you were supposed to pick up both [sand and paint barrels] at Service Painting at the same time; is that right?

A Correct.

Q And the ten yards of sand you were supposed to treat as solid fill?

A Correct.

Q And wouldn't it have been easier for you to just put the ten yards of sand and the 20 barrels of paint on the same load?

A How am I going to dump it?

Q Can't you just take it to 27th Street and just dump it?

A How am I going to dump it? It's not going to come out of the tailgate. I can't put barrels on the tandem, and that's the only truck that has the capability or strength to handle a load like that. The stake job does not handle that.

*Ivancich Deposition* (February 2, 1990) at 34–35. Clearly this colloquy does not support, and in fact rebuts, Acme's argument.

Second, Acme argues that the waste found at the site was consistent with the sort of waste Service Painting would have generated. In fact, Acme claims that Ivancich actually identified Service Painting's waste when shown DNR photographs of the excavated Fadrowski site. However, when the testimony is examined as a whole, it seems fairly ambiguous:

Q Can you tell me if you recall where [five-gallon] containers like that might have come from?

A Yeah, I don't know. I am not sure. I know I've hauled them. I don't know exactly where they came from.

\* \* \* \* \* \*

Q Could they have come from Service Painting?

A Very possible. Yes. Um-hum (affirmative).

*Ivancich Deposition* (February 2, 1990) at 62–63.

Although Acme does a better job placing Service Painting's hazardous waste at the Fadrowski site than some of the other "fast-track" defendants, it still relies largely on speculation. The fact that relatively common waste—paint cans—was found at the site, and that when pressed, Ivancich speculated that it could have been Service Painting's waste, is simply not enough to survive summary judgment. Acme has not introduced sufficient evidence to indicate to the Court that a reasonable jury could conclude that Service's waste was disposed of at the Fadrowski site, especially in light of the affirmative evidence introduced by Service Painting that its paint-can waste was disposed of elsewhere. Therefore, Service Painting's summary judgment motion on Acme's CERCLA claims will be granted. Acme's corresponding summary judgment motion seeking to hold Service Painting liable under CERCLA as a matter of law will therefore be denied.

■■■ However, Service Painting's summary judgment motion regarding Acme's RCRA claim must fail because Service Painting has conceded that it has disposed of solid waste at the Fadrowski site. It has pointed to no evidence to support the proposition that its solid waste is not contributing or has not contributed to any imminent and substantial endangerment that might exist at the site. It has not met its initial burden as a summary judgment movant. In the absence of any contrary evidence, it is reasonable to conclude that the sand disposed of at the site may have contributed to any hazards that might exist. Therefore, Service Painting's summary judgment motion on Acme's RCRA claims will be denied.

### 11. Texaco

■■■ Various service stations affiliated with Texaco Inc. ("Texaco") employed the services of Ed's Trucking to transport and dispose of waste materials on many occasions between 1970 and 1979. In its motion for summary judgment, Texaco argues that (1) Acme cannot prove that Texaco waste was disposed of at the Fadrowski site, (2) even if waste was disposed of at the Fadrowski site, Acme cannot show that the waste was hazardous, and (3) the individual service stations, rather than Texaco, were responsible for the disposal of any waste they generated.

Texaco's first argument in support of summary judgment is dispositive. It contends that Acme has introduced no evidence that Texaco waste was ever disposed of at the Fadrowski site. While it admits that Ed's Trucking did pick up waste from Texaco service stations, Texaco contends that all of this waste was sent to the County Landfill, not to the Fadrowski site. In support of its position, Texaco points to the general policy of Ed's Trucking to dispose of rubbish at the County Landfill, *see* § III.B.2, *supra*, as well as the following deposition testimony of Anthony Ivancich:

Q And can you tell me whether its possible that some of that [Texaco] rubbish went to South 27th Street?

A I don't believe it can. I don't believe so.

Q You don't believe so?

A No, sir.

Q Can you positively state that it didn't?

A Went on the rubbish truck. That's all I know. I would say no.

Q But you're unsure?

A Yes. . . .

*Ivancich Deposition* (February 2, 1990) at 30. Ivancich further testified that:

Q Are you telling me that you didn't do any pick ups at Texaco gas stations?

A Not by myself. Mr. Fadrowski was with me.

Q And do you know where Mr. Fadrowski dumped the material?

A At the County landfill site.

*Ivancich Deposition* (March 8, 1990) at 197.

Acme's argument in opposition to Texaco's summary judgment motion is identical to its arguments advanced in opposition to other "fast-track" defendants' motions. It basically contends that because some mixed loads of rubbish and solid waste were dumped at the Fadrowski site and because the wastes found at the site are consistent with the type of

waste typically generated by a service station, it is reasonable to conclude that Texaco waste was disposed of at the Fadrowski site.

Acme's argument fails for several reasons. First and foremost, the inferential chain Acme relies on is too weak to create a genuine issue of fact in light of affirmative evidence introduced by Texaco. Moreover, Acme's rogue dumping hypothesis is even weaker here than against other "fast-track" defendants because it was Ivancich who dumped partial loads of rubbish at the Fadrowski site in violation of Ed Fadrowski's policy and practice. Here, Fadrowski himself drove the truck to pick up Texaco's waste. Acme points to no evidence that supports an inference that Fadrowski departed from his general policy at all, much less specifically when hauling Texaco waste.

Because Acme has not established a triable issue regarding whether Texaco waste was disposed of at the Fadrowski site, the Court will grant Texaco's motion for summary judgment on this basis and will dismiss all RCRA and CERCLA claims against it. Therefore, the Court does not need to decide the other grounds asserted by Texaco in support of its motion.

### 12. Williams Petroleum, Inc.

At all times pertinent to this lawsuit, Williams Petroleum, Inc. ("Williams") was engaged in the business of selling, installing, and repairing gasoline and oil displacing equipment, including storage tanks. *Affidavit of Thomas E. Williams* at ¶ 2. In connection with some of its jobs, Williams excavated soil and concrete in order to get access to existing tanks and lines to make space for new tanks and equipment. *Williams Affidavit* at ¶ 3. On ten occasions between 1977 and 1978, Williams hired Ed's Trucking to remove soil and concrete it had excavated.

Williams moves the Court for summary judgment on the grounds that (1) Acme has produced no evidence that Williams' waste was actually disposed of at the Fadrowski site and (2) Acme has produced no evidence that Williams' waste was hazardous. Williams first argument can be quickly dismissed. Although Acme has not pointed to any direct evidence that Williams' waste was

disposed of at the site, it has presented a strong inferential case based on the following: (a) it is undisputed that Ed's Trucking hauled waste for Williams; (b) Ed's general practice was to dispose of solid fill, like that generated by Williams, at the Fadrowski site; and (c) the pollutants and contaminants found in the waste generated by Williams are consistent with the pollutants and contaminants found at the Fadrowski site. *Radcliffe Affidavit* at 19(c). In the absence of any affirmative evidence contesting these facts by Williams, this is enough to survive a summary judgment motion.

Williams second argument—that any wastes it did dispose of at the site were not hazardous—has two components. First, Williams contends that Acme has introduced no evidence that its waste included any hazardous substances. It points to the following testimony in support of its position. First, Ed Fadrowski testified:

Q And what type of materials did you haul for Williams Company?

A Concrete.

*Fadrowski Deposition* (August 21, 1984) at 91–92. Second, Fadrowski's secretary at the time, Marcia Smith, testified that Fadrowski had "picked up a load of, I think some concrete and some land fill" from Williams. *Smith Deposition* (February 19, 1985) at 64. Finally, Williams points to the affidavit of its own president, Thomas Smith, which states that Williams only used Ed's to haul away dirt or concrete. *Williams Affidavit* ¶ 15.

In response, Acme points to the following deposition testimony of Thomas Williams:

Q It is true, though, that Ed's Trucking and Povlick each would have hauled excavated materials that were contaminated with petroleum products?

\* \* \*

A There's a possibility, yes, that either one of them could have hauled.

*Deposition of Thomas E. Williams* (July 25, 1990) at 29–30. Moreover, in this situation Acme does benefit from the presumption that it attempts to invoke elsewhere: having established that the defendant's waste was disposed of at the Fadrowski site and that the

defendant's waste generally matches the waste found at the site, Acme has satisfied its prima facie case on its CERCLA claims.

More troubling for Acme is Williams' second argument: that petroleum wastes are not classified as hazardous wastes for the purposes of CERCLA. Williams argues that even if Acme can show that the waste it disposed of at the Fadrowski site contained hazardous substances, the only potentially hazardous substances the waste could have contained are petroleum constituents. Williams points to Acme's answer to Williams' first set of interrogatories and request for production of documents, in which Acme alleges that the Fadrowski site is contaminated by substances, pollutants or contaminants similar to those found in soils surrounding underground storage tanks and automotive lifts, such as benzene, ethyl benzene, toluene and xylene—all petroleum constituents.

CERCLA's hazardous substances definitions section includes the following exclusion:

> The term does not include petroleum, including crude oil or any fraction thereof which is not otherwise specifically listed or designated as a hazardous substance ... and the term does not include natural gas, natural gas liquids, liquified natural gas, or synthetic gas useable for fuel.

42 U.S.C. § 9601(14). The Ninth Circuit, in *Wilshire Westwood Associates v. Atlantic Richfield Corporation,* 881 F.2d 801 (9th Cir. 1989), interpreted this clause to include unrefined and refined gasoline, even though certain of its indigenous components and certain additives during the refining process have themselves been designated as hazardous substances within CERCLA. The court concluded that CERCLA's petroleum exclusion covers gasoline as well as its hazardous constituents: benzene, ethyl benzene, toluene and xylene, even though these hazardous constituents are specifically listed as hazardous substances under CERCLA. *Wilshire Westwood,* 881 F.2d at 810. *See also Cose v. Getty Oil Co.,* 4 F.3d 700, 704 (9th Cir.1993) ("If a specifically listed hazardous substance is indigenous to petroleum and is present as a result of a release of petroleum, such substance will fall within the petroleum exclusion unless it is present at a concentration level that exceeds the concentration level that naturally occurs in the petroleum product."); *Niecko v. Emro Marketing Co.,* 769 F.Supp. 973, 981 (E.D.Mich.1991) ("This 'petroleum exclusion' has been universally interpreted ... to remove from the coverage of CERCLA those otherwise hazardous substances which are inherent in petroleum....").

In opposition, Acme contends that "it would be an improper interpretation and extension of the [petroleum] exclusion to apply it to the disposal of excavated waste soils contaminated with various waste or spent petroleum products containing hazardous substances." *Plaintiff's Brief in Opposition to "Fast Track" Summary Judgment Motions* at 106. Thus, it argues, "any common sense definition of 'petroleum' cannot be reasonably ... extended to encompass excavated soils contaminated with petroleum products." *Id.* at 106–107.

This argument is unpersuasive. It is difficult to imagine how petroleum products could contaminate the site unless they spilled, and thus mixed with the surrounding soil. Moreover, the current factual situation is identical to that presented in *Wilshire Westwood,* in which the complaint alleged that the "gasoline stored in leaking underground storage tanks ... contained additives with hazardous substances including, but not limited to, benzene, toluene, xylene, ethyl-benzene and lead [which] leaked from the underground storage tanks and contaminated soils." *Wilshire Westwood,* 881 F.2d at 802. The Court sees no reason to hold any differently here.

■ Accordingly, Williams' motion for summary judgment on Acme's CERCLA claims will be granted because Acme has not created a triable issue as to whether hazardous substances other than petroleum products were disposed of at the Fadrowski site. However, because the Court concludes that Williams has disposed of *solid* waste at the Fadrowski site, and because there is a genuine issue of fact as to whether it thus contributed to any imminent and substantial endangerment that might exist, Williams summary judgment motion on Acme's RCRA claims will be denied.

## IV. SUMMARY

For the foregoing reasons, it is hereby ordered that:

1. Acme's motion for partial summary judgment against Menard on Acme's RCRA claims is denied. Acme's motion for partial summary judgment against Menard on Acme's CERCLA claims is granted.

2. Defendant Bel–Aire Enterprises' motion for summary judgment on Acme's CERCLA claims is granted. Defendant Bel–Aire Enterprises' motion for summary judgment on Acme's RCRA claims is denied. Acme's cross-motion for summary judgment against Bel–Aire is denied.

3. Defendant Cambridge Chemical, Inc.'s motion for summary judgment on its liability for CERCLA and RCRA claims is granted.

4. Defendant Cardinal Fabricating's motion for summary judgment on its liability for CERCLA and RCRA claims is granted.

5. Defendant Commercial Heat Treating's motion to supplement the record is granted. Plaintiff will have 30 days from the date of this order to respond, and Commercial will have 15 days after that to reply. The Court will hold Commercial Heat Treating's motion for summary judgment and Acme's cross motion for summary judgment in abeyance until briefing is complete.

6. Defendant Hartwig Exhibition's motion for summary judgment on its liability for CERCLA and RCRA claims is granted.

7. Defendant Helmut's Building Service's motion for summary judgment on its liability for CERCLA and RCRA claims is granted.

8. Defendant Lincoln Savings Bank's motion for summary judgment on its liability for CERCLA and RCRA claims is granted.

9. Defendant Richard Drexler's motion for summary judgment is denied. Acme's cross-motion for summary judgment is also denied.

10. Defendant Robert Howell's motion for summary judgment on his liability for CERCLA and RCRA claims is granted. Acme's cross-motion for summary judgment is therefore denied.

11. Defendant Pemper Engineering Co. Inc.'s motion for summary judgment is granted to the extent that Acme's claims involve arranging for the disposal of hazardous waste through Ed's Trucking. Pemper's motion for summary judgment is denied with respect to Acme's claims that it disposed of its waste oil through Lubricants Inc. Acme's cross-motion for summary judgment is denied.

12. Defendant Service Painting Corporation's motion for summary judgment on Acme's CERCLA claims is granted. Service Painting Corporation's motion for summary judgment on Acme's RCRA claims is denied. Acme's cross-motion for summary judgment is denied.

13. Defendant Texaco's motion for summary judgment on its liability for CERCLA and RCRA claims is granted.

14. Defendant Williams Petroleum, Inc.'s motion for summary judgment on Acme's CERCLA claims is granted. Williams Petroleum, Inc.'s motion for summary judgment on Acme's RCRA claims is denied. Acme's cross-motion for summary judgment is denied.

It is further ordered that all counsel appear before the Court for a status conference to be held in Courtroom 390 of the Federal Building, 517 East Wisconsin Avenue, Milwaukee, Wisconsin on *Thursday, January 5, 1995 at 9:00 a.m.*

**SO ORDERED.**