[936 NYS2d 342]

In the Matter of GRACIE POINT COMMUNITY COUNCIL, by Its President, Anthony Ard, et al., Appellants, v NEW YORK STATE DEPARTMENT OF ENVIRONMENTAL CONSERVATION et al., Respondents.

Third Department, December 29, 2011

---

**APPEARANCES OF COUNSEL**

*Boies, Schiller & Flexner, L.L.P.*, Albany (*George F. Carpinello* of counsel) and *Kramer, Levin, Naftalis & Frankel, L.L.P.*, New York City (*Jeffrey L. Braun* of counsel), for appellants.

*Eric T. Schneiderman, Attorney General*, Albany (*Lisa M. Burianek* of counsel), for New York State Department of Environmental Conservation and another, respondents.

*Michael A. Cardozo, Corporation Counsel*, New York City (*Jane L. Gordon* of counsel), for New York City Department of Sanitation, respondent.

*James T.B. Tripp*, New York City, for Environmental Defense Fund, respondent.

*Wilmer, Cutler, Pickering, Hale & Dorr, L.L.P.*, New York City (*Charles C. Platt* of counsel), for Residents Sane Trash Solutions, amicus curiae.

**OPINION OF THE COURT**

MERCURE, A.P.J.

The City of New York generates approximately 50,000 tons per day in waste and recyclables. After the Fresh Kills landfill in the Borough of Staten Island closed in 2001, the majority of the City's waste managed by respondent New York City Department of Sanitation (hereinafter DSNY), as well as commercial waste collected by private haulers, was delivered to private transfer stations and then transferred to long-haul trucks for disposal in landfills primarily located in other states. The City's heavy reliance on trucks and the heavy concentration of private transfer stations in community districts located in the Boroughs of Brooklyn, the Bronx and Queens led to concern about the health and environmental impacts to those communities.

In 2004, DSNY released a proposed new solid waste management plan (hereinafter SWMP) (*see* ECL 27-0107) for the management of the City's solid waste for the next 20 years. The SWMP is designed to minimize reliance on the truck-dependent facilities in Brooklyn, the Bronx and Queens by relying on trains or barges, instead of trucks, to export waste. The SWMP would reduce, by 5.6 million miles annually, the distance traveled by DSNY trucks and related long-haul transfer trailers within the city. Under the SWMP, four city-owned, marine garbage transfer stations—one in Manhattan, one in Queens and two in Brooklyn—would be converted into new facilities designed to accept waste and transfer it to leak-proof containers for shipment by barge or rail to final disposal sites. One of the inactive transfer stations to be demolished and rebuilt is located at East 91st Street in the Gracie Point neighborhood of Manhattan; that is the project at issue here.

The Gracie Point facility, which is located along the East River waterfront, operated from approximately 1940 until 1999. The new transfer station would occupy the same location as the existing facility, but with a larger footprint over the water,

requiring dredging of the East River and disturbance of tidal wetlands. The entrance ramp would follow the same footprint as the existing ramp but include 14-foot high sound barriers, a computerized weighing station and a larger tipping floor to eliminate on-street queuing of trucks. The ramp crosses FDR Drive and is abutted on both sides by a recreational facility, the Asphalt Green sports and recreational complex; the transfer station itself is separated from the recreational area by FDR Drive. Although the site is zoned light industrial, the area in the immediate vicinity of the site is now primarily residential. The facility would have a maximum peak limit of 1,860 tons per day of garbage—or, petitioners maintain, an average of eight trucks per hour—with higher limits authorized during upset or emergency conditions.

Beginning in 2004, DSNY, as lead agency, and respondent Department of Environmental Conservation (hereinafter DEC), as an involved agency, undertook environmental review of the SWMP under the State Environmental Quality Review Act (see ECL art 8 [hereinafter SEQRA]) and its city counterpart, the City Environmental Quality Review Procedure. After an extensive public review and comment process, DSNY issued a final environmental impact statement (hereinafter FEIS) for the SWMP. Prior proceedings and actions commenced by local residents and community groups, including most of the petitioners in this proceeding, challenged the siting of the transfer station, the adequacy of the FEIS on various grounds, and the City's failure to obtain state legislative approval under the public trust doctrine. Those proceedings and actions were dismissed (see Powell v City of New York, 85 AD3d 429 [2011], lv denied 17 NY3d 715 [2011]; Association for Community Reform Now ["ACORN"] v Bloomberg, 52 AD3d 426 [2008], lv denied 11 NY3d 707 [2008]; Matter of Powell v City of New York, 16 Misc 3d 1113[A], 2007 NY Slip Op 51409[U] [2007]). As relevant here, the Appellate Division, First Department concluded that DSNY and other city respondents (1) "took the requisite 'hard look' at the relevant areas of environmental concern" (Association for Community Reform Now ["ACORN"] v Bloomberg, 52 AD3d at 428); (2) rationally concluded that the inability of the transfer station to meet zoning noise restrictions was irrelevant due to background noise levels that already exceeded the zoning performance standard (id. at 427); (3) "rationally rejected a Harlem River Yard site in the Bronx based on the policy objective of avoiding the trucking of 'Manhattan waste' to a facility

in another borough" (*id.* at 429); and (4) were not required to seek approval from the State Legislature prior to construction and operation of the transfer station and access ramp because "the Asphalt Green sports center and Bobby Wagner Walk, a pedestrian thoroughfare along the East River . . . do not constitute parkland subject to the public trust doctrine" (*Powell v City of New York*, 85 AD3d at 430-431). DEC approved the SWMP in October 2006.

DSNY also submitted applications to DEC seeking the permits required for construction and operation of the transfer station, including a solid waste management facility permit, a tidal wetlands permit and a use and protection of waters permit, with an associated water quality certification. DEC determined that the applications satisfied all of its regulatory requirements and issued draft permits subject to numerous conditions to protect public health, safety and the environment. The matter was then referred to DEC's Office of Hearings and Mediation Services and assigned to an Administrative Law Judge (hereinafter ALJ).

Petitioners, a group of residents and community organizations with an interest in the Gracie Point neighborhood, and respondent Environmental Defense Fund (hereinafter EDF) petitioned for full party status. Following a legislative hearing and an issues conference, the ALJ concluded that a substantive and significant issue had been raised regarding whether the project would comply with the operational noise requirement set forth in 6 NYCRR 360-1.14 (p), and granted full party status to both petitioners and the EDF (*see* 6 NYCRR 624.5 [d] [1]).[1] The ALJ further determined, however, that none of the remaining issues raised by petitioners warranted an adjudicative hearing or amendment of the draft permit. Upon petitioners' appeal, respondent Assistant Commissioner of Environmental Conservation affirmed and directed DEC to issue the requested permits and water quality certification.

Petitioners then commenced two proceedings pursuant to CPLR article 78 in Supreme Court, Albany County and New York County. The proceedings were consolidated pursuant to a stipulation of the parties and, thereafter, Supreme Court, Albany County dismissed. Petitioners appeal, and we now affirm.

---

1. Following submission of a noise analysis report and a supplemental noise report, the ALJ issued a supplemental ruling that no issue remained regarding the ability of the proposed transfer station to comply with the operational noise requirements of 6 NYCRR part 360. Petitioners did not appeal the supplemental ruling.

■ Initially, we reject petitioners' argument that DEC's determination to issue the requested permits amounts to a "declaration of regulatory impotence when it comes to protecting public health, safety and welfare" and an express disavowal of its mandate to first consider the health, safety and welfare of the people of New York in deciding whether to grant such permits. The basis for this argument is DEC's conclusion that 6 NYCRR 360-1.11 (a) (1) does not provide an independent basis to deny a permit that meets the permit issuance criteria, which are set forth in 6 NYCRR 360-1.10. It is settled, however, that "the interpretation given to a regulation by the agency which promulgated it and is responsible for its administration is entitled to deference if that interpretation is not irrational or unreasonable" (*Matter of Gaines v New York State Div. of Hous. & Community Renewal*, 90 NY2d 545, 548-549 [1997]; *see Matter of Brooklyn Assembly Halls of Jehovah's Witnesses, Inc. v Department of Envtl. Protection of City of N.Y.*, 11 NY3d 327, 334 [2008]). In our view, DEC's interpretation of its regulations was rational and, thus, entitled to deference.

In ECL 27-0703 (2) (a), the Legislature authorized DEC to promulgate regulations governing the operation of solid waste management facilities, and provided that such regulations "shall be directed at the prevention or reduction of . . . conditions inimical to the public health, safety and welfare." The relevant regulations are found in 6 NYCRR part 360 and, as DEC explained, the criteria for issuance of a solid waste management facility permit are found in 6 NYCRR 360-1.10. In contrast, the authority to impose conditions to mitigate, "to the extent practicable, . . . significant adverse impact[s] on public health [and] safety" is set forth in 6 NYCRR 360-1.11 (a) (1). The ALJ concluded, and the Assistant Commissioner concurred, that DEC addressed its mandate to protect public health and safety through the promulgation of regulations embodying operational requirements, and that DEC must deny a solid waste management permit pursuant to 6 NYCRR 360-1.10 if the applicant cannot demonstrate its ability to operate in accordance with the regulations, which take into account public health, safety and welfare. Inasmuch as 6 NYCRR 360-1.11 (a) authorizes permit conditions to mitigate, where practicable, the adverse impacts in those cases in which there has been a demonstration of ability to meet permit issuance criteria in the first instance, DEC rationally concluded that 6 NYCRR 360-1.11 (a) does not provide an independent basis for denial of a solid waste permit. Indeed,

this interpretation is supported by the language of the regulations on their face. According the deference due to DEC's interpretation of its regulations, we cannot conclude that it misinterpreted those regulations or failed to comply with its statutory duty of assessing whether the requested permits should be denied on the ground that the facility would harm public health, safety and welfare (*see Matter of Stephentown Concerned Citizens v Herrick*, 280 AD2d 801, 804-805 [2001], *lv dismissed and denied* 96 NY2d 881 [2001]).

■ Similarly, DEC rationally determined that petitioners failed to raise any substantive and significant issues for adjudication (*see* 6 NYCRR 624.4 [c] [1] [iii]). An issue raised by a third party will be found "substantive" only "if there is sufficient doubt about the applicant's ability to meet statutory or regulatory criteria applicable to the project" (6 NYCRR 624.4 [c] [2]). Such "[a]n issue is significant if it has the potential to result in the denial of a permit, a major modification to the proposed project or the imposition of [additional] significant permit conditions" (6 NYCRR 624.4 [c] [3]). We are mindful that "[t]he resolution of whether an issue is substantive and significant requiring an adjudicatory hearing is left to the Commissioner [of Environmental Conservation] and will not be disturbed absent a showing that 'it is predicated upon an error of law, is arbitrary or capricious, or represents an abuse of discretion' " (*Saratoga Water Servs. v Zagata*, 247 AD2d 788, 789-790 [1998], quoting *Matter of Regional Action Group for Envt. v Zagata*, 245 AD2d 798, 800 [1997], *lv denied* 91 NY2d 811 [1998]; *see Matter of Eastern Niagara Project Power Alliance v New York State Dept. of Envtl. Conservation*, 42 AD3d 857, 861 [2007]). Furthermore, "where, as here, the judgment of the agency involves factual evaluations in the area of the agency's expertise and is supported by the record, such judgment must be accorded great weight and judicial deference" (*Flacke v Onondaga Landfill Sys.*, 69 NY2d 355, 363 [1987]).

Petitioners assert that DEC should not have issued the permits because DSNY's application did not specify the ultimate disposal site or the transfer route for the solid waste, as required by 6 NYCRR 360-11.2 (a) (3). Petitioners maintain that it is irrational to allow a facility to be constructed and commence operation before it can be determined that the purpose of the facility—the disposal of garbage—can be fulfilled. It is undisputed that DSNY did not specify the disposal site or transfer route in its initial permit application because the City's required

competitive procurement process had not been completed. DSNY did include, however, an interim transfer, transport and disposal plan demonstrating available disposal capacity that exceeded the waste that would be generated by the facility. In addition, DEC added a special condition to the draft permit requiring DSNY to provide a final transfer, transport and disposal plan at least 90 days prior to commencement of operations. Given this condition—and inasmuch as the interim plan was sufficient to address petitioners' concerns that the purpose of the facility can be fulfilled and to "provid[e] sufficient detail to demonstrate that the . . . operation . . . of the facility will be capable of compliance with [6 NYCRR part 360]" (6 NYCRR 360-1.9 [a] [2] [iii])—DEC acted reasonably and practically in allowing DSNY to delay providing the final plan until the City's competitive procurement process has been completed.

Nor did DEC err in concluding that petitioners failed to raise an issue for adjudication regarding a claimed zoning violation and diesel emission impacts. Petitioners' zoning challenge was based on an indication in the FEIS that the background noise levels at a particular location on the site boundary exceed those permitted by the applicable zoning law. We note that the FEIS also indicated that the high noise level was due largely to the adjacent FDR Drive, and noise from the facility could not be perceived due to the existing level of background noise. Furthermore, although the permit requires DSNY to comply with all applicable local laws, the First Department has concluded that the City could rationally determine that its zoning ordinance would not be violated by operation of the facility because "the theoretical exceedance at the boundary could not be perceived" (*Association for Community Reform Now ["ACORN"] v Bloomberg*, 52 AD3d 426, 427 [2008], *supra*). Given the absence of any impact and DEC's lack of authority to adjudicate legal issues concerning zoning laws (*see Matter of Town of Poughkeepsie v Flacke*, 84 AD2d 1, 5 [1981], *lv denied* 57 NY2d 602 [1982]), DEC properly concluded that no further mitigation strategy or adjudicatory hearing on this issue was necessary.

Petitioners also challenged the adequacy of a condition in the permit requiring compliance with a city regulation imposing strict diesel emission controls on DSNY-owned trucks because the regulation and permit condition do not apply to private

haulers.[2] Petitioners failed to demonstrate, however, either that DEC has the authorization to regulate private mobile emission sources or that such a condition would be necessary in light of measures in the permit designed to minimize air pollution impacts and, thus, DEC did not act arbitrarily or capriciously in refusing to extend the condition to private haulers.

Finally, petitioners contend that the tidal wetlands and use and protection of waters permits should have been denied because DSNY failed to show that the proposed facility is "reasonable and necessary" (6 NYCRR 608.8 [a]; 661.9 [b] [1] [iii]). Specifically, petitioners assert that DEC improperly deferred to the City's policy of "borough equity"—i.e., the attempt in the SWMP to achieve a more equitable solid waste transfer system by reducing the trucking of Manhattan waste to transfer facilities in other boroughs—rather than giving adequate consideration to their proposed alternative site, the Harlem River Yard facility located in the Bronx. Petitioners do not dispute that their proposed location is incompatible with the policies set forth in the SWMP of borough equity and a transition from truck-based to marine-based transport of waste. Inasmuch as DEC approved the SWMP in 2006, its reliance on the policies contained therein was not arbitrary and capricious. Moreover, as in the context of the SEQRA challenges to the facility, the record here reflects that "DSNY's analysis of alternatives to the proposed project was sufficient" (*Association for Community Reform Now ["ACORN"] v Bloomberg*, 52 AD3d at 428). We agree with the First Department that DSNY—and DEC—"rationally rejected [the] Harlem River Yard site in the Bronx based on the policy objective of avoiding the trucking of 'Manhattan waste' to a facility in another borough" (*id.* at 429). In short, given the City's comprehensive plan to reduce air pollution and traffic congestion by minimizing its dependence on trucks for the handling of its solid waste, DEC rationally determined that the potential adverse impacts of this water project were balanced by public necessity for this project (*see Saratoga Water Servs. v Zagata*, 247 AD2d 788, 790 [1998], *supra*).

Petitioners' remaining arguments have been considered and found to be lacking in merit.

---

**2.** EDF, which negotiated the special condition insofar as it applies to DSNY-owned trucks, maintains that DEC's decision not to extend the condition to private haulers was reasonable.

MALONE JR., STEIN, McCARTHY and EGAN JR., JJ., concur.

Ordered that the order and judgment is affirmed, without costs.