[986 NYS2d 258]

In the Matter of THOMPSON CORNERS, LLC, et al., Appellants, v
  NEW YORK STATE DEPARTMENT OF ENVIRONMENTAL CONSER-
  VATION et al., Respondents.

Third Department, May 15, 2014

82

**APPEARANCES OF COUNSEL**

*Whiteman, Osterman & Hanna, LLP*, Albany (*John J. Henry* of counsel), for appellants.

*Eric T. Schneiderman, Attorney General*, Albany (*Denise Hartman* of counsel), for respondents.

**OPINION OF THE COURT**

STEIN, J.

In this CPLR article 78 proceeding, the issue before us—apparently one of first impression in the courts of this state—is whether a subsequent owner of property formerly used as a permitted hazardous waste treatment, storage or disposal (hereinafter TSD) facility is subject to the requirement set forth in ECL article 27, title 9 and the regulations enacted by respondent Department of Environmental Conservation (hereinafter DEC) (6 NYCRR subpart 373-2) to provide financial assurance for the ongoing performance of corrective action on the property. Based upon our review of the applicable statutes and regulations, and particularly in view of the absence of any express language to that effect therein, we conclude that a subsequent owner is not, without more, subject to such requirements.

The relevant facts are as follows: Roth Brothers Smelting Corporation owned and operated a metals recovery facility in the City of Syracuse, Onondaga County. In 1987, Roth obtained a permit for the operation of a hazardous waste storage facility on the property (*see* ECL 27-0913). After the permit expired in 1992, Roth ceased operations and, in accordance with DEC

requirements, was directed to take certain corrective action to address contaminated soil and groundwater on the property (*see* ECL 71-2727 [3]; 6 NYCRR 373-2.7).[1] Pursuant to a 1994 order on consent (hereinafter the Roth order), Roth was required to, among other things, submit "a detailed post-remedial operation and maintenance plan," construct an on-site corrective action management unit (hereinafter CAMU)[2] to hold approximately 21,000 tons of treated soil, and provide financial assurance for the plan.[3] In connection therewith, Roth recorded a declaration of covenants and restrictions, which provided public notice of, among other things, the Roth order and information about the contaminants found on the property and the existence of the CAMU.

In 1999, Roth sold the property to Wabash Aluminum Alloys, LLC, whose sole shareholder was Connell Limited Partnership (hereinafter collectively referred to as Wabash). Petitioner Thompson Corners, LLC purchased the property from Wabash in 2005 and later sold a portion thereof to petitioner Metalico Syracuse Realty, Inc. Metalico thereafter assumed responsibility for conducting environmental monitoring and testing and general oversight of the CAMU.

In 2007, DEC commenced an enforcement proceeding against Wabash and petitioners (*see* ECL 71-2727),[4] alleging that they were current or former owners and/or operators of a facility subject to the state's hazardous waste management regulations, that past releases of hazardous waste at the facility necessitated remediation via DEC-ordered corrective action and that Wabash and petitioners had failed to provide the requisite financial assurance to guarantee completion of the corrective action (*see* 6 NYCRR 373-2.6 [1]). DEC and Wabash entered into a consent order, in which Wabash agreed that "[it] and/or other responsible part[ies]" would secure financial assurance. As to petitioners,

---

**1.** The soil became contaminated with, among other things, polychlorinated biphenyls (PCBs) and a variety of heavy metals.

**2.** A CAMU is defined as "an area within a facility that is used only for managing remediation wastes" in the context of a corrective action or other cleanup (6 NYCRR 370.2 [b] [37]).

**3.** The Roth order was binding upon Roth, as well as its successors and assigns, and expressly states that "[a]ny change in ownership or corporate status of [Roth] including, but not limited to, any transfer of assets or real or personal property shall in no way alter [Roth's] responsibilities under this Order."

**4.** Metalico Aluminum Recovery, Inc.—an affiliate of Metalico—was named in that proceeding. For our purposes herein, we refer to both of those entities, collectively, as Metalico, and collectively with Thompson as petitioners.

DEC moved for an order without a hearing (*see* 6 NYCRR 622.12) and petitioners cross-moved for the same relief. An Administrative Law Judge (hereinafter ALJ) issued a ruling and report, finding petitioners—as owners of a hazardous waste facility—to be jointly and severally responsible for providing financial assurance and recommending that they be required to pay civil penalties for their failure to do so. After respondent Commissioner of Environmental Conservation adopted the ALJ's report (with one exception discussed below), petitioners commenced this CPLR article 78 proceeding to annul the Commissioner's determination. Supreme Court summarily dismissed the petition, and granted respondents' counterclaim for enforcement of the Commissioner's determination. This appeal ensued.

By way of background, the federal Resource Conservation and Recovery Act of 1976 (*see* 42 USC § 6901 *et seq.* [hereinafter RCRA]) established strict guidelines for the classification, handling and treatment of solid and hazardous waste (*see Meghrig v KFC Western, Inc.*, 516 US 479, 483 [1996]; *Chicago v Environmental Defense Fund*, 511 US 328, 331 [1994]; *American Chemistry Council v Environmental Protection Agency*, 337 F3d 1060, 1065 [DC Cir 2003]). RCRA is a proactive, "cradle to grave" regulatory scheme for the day-to-day handling of the treatment, storage or disposal of such waste (*Environmental Defense Fund v Environmental Protection Agency*, 852 F2d 1316, 1318 [DC Cir 1988], *cert denied* 489 US 1011 [1989]; *see Meghrig v KFC Western, Inc.*, 516 US at 483; *American Iron & Steel Inst. v United States Environmental Protection Agency*, 886 F2d 390, 393 [DC Cir 1989], *cert denied* 497 US 1003 [1990]). Notably, "[u]nlike the Comprehensive Environmental Response, Compensation, and Liability Act of 1980 (CERCLA), RCRA is not principally designed to effectuate the cleanup of toxic waste sites" (*Meghrig v KFC Western, Inc.*, 516 US at 483 [citation omitted]). Its "primary purpose, rather, is to reduce the generation of hazardous waste and to ensure the proper treatment, storage, and disposal of that waste which is nonetheless generated, 'so as to minimize the present and future threat to human health and the environment' " (*id.*, quoting 42 USC § 6902 [b]; *accord Cordiano v Metacon Gun Club, Inc.*, 575 F3d 199, 204-205 [2d Cir 2009]).

The Environmental Protection Agency has the authority under RCRA to require corrective or remedial action to counteract releases of hazardous waste from regulated facilities (*see* 42 USC § 6924 [u]), including requiring regulated entities

to provide financial assurance (*see* 42 USC § 6924 [a] [6]), and has delegated to the states the authority to oversee their own hazardous waste programs in full satisfaction of RCRA's regulatory requirements (*see* 42 USC § 6926 [b]). In accordance therewith, New York has implemented a hazardous waste management program (*see* ECL art 27, tit 9) and DEC has promulgated regulations thereunder (*see* 6 NYCRR parts 370-374), which are, as required, "consistent with comparable [federal] standards" under RCRA (ECL 27-0911 [1]).

Turning to New York's version of RCRA, we begin with ECL 27-0911 (1)—the "[s]tandards applicable to owners and operators of hazardous waste [TSD] facilities." Such standards expressly "require corrective action . . . for all releases of hazardous waste or constituents from any solid waste management unit at a [TSD] facility *seeking a permit* under [ECL 27-0913]" (ECL 27-0911 [2] [emphasis added]).[5] The regulations promulgated by the Commissioner (*see* 6 NYCRR subpart 373-2) "establish minimum [s]tate standards which define the acceptable management of hazardous waste" (6 NYCRR 373-2.1 [a] [1]). Such standards, which are expressly applicable to owners and operators of TSD facilities (*see* 6 NYCRR 373-2.6 [a] [1] [i]), require, among other things, that "[a]ll solid waste management units . . . comply with the [corrective action] requirements" (6 NYCRR 373-2.6 [a] [1] [ii]), including making "assurances of financial responsibility for completing such corrective action" (6 NYCRR 373-2.6 [l] [2]; *see* 6 NYCRR 373-2.6 [l] [1]; ECL 27-0917 [9]).[6] In turn, consistent with the governing statute (*see* ECL 27-0911 [2]), that part of the regulation entitled "[c]orrective action for solid waste management units" provides that

> "[t]he owner or operator of a facility *seeking a permit* for the treatment, storage or disposal of hazardous waste must institute corrective action . . . for all releases of hazardous waste or constituents from any solid waste management unit at the facil-

---

**5.** Under the ECL, "[n]o person shall engage in storage, treatment, or disposal . . . of hazardous wastes without first having obtained a permit" (ECL 27-0913 [1] [a]). However, we agree with respondents that the requirements of RCRA apply to a TSD facility, even if its owner/operator did not obtain a permit (*see United States v Power Eng'g Co.*, 191 F3d 1224, 1233 [10th Cir 1999], *cert denied* 529 US 1086 [2000]).

**6.** Financial assurance can be provided by, among other things, a trust fund, surety bond, letter of credit or post-closure insurance (*see* 6 NYCRR 373-2.8 [d], [f]).

ity, regardless of the time the waste was placed in such unit" (6 NYCRR 373-2.6 [l] [1] [emphasis added]).

Thus, on its face, the regulatory framework appears to contemplate that corrective action—and attendant financial assurance requirements—are to be imposed as a condition of obtaining a permit to operate a TSD facility.

Here, the Commissioner did not determine that petitioners were TSD owners or operators[7] and there is no evidence that they have ever been required to obtain a TSD permit for the property. Instead, respondents argue, and the Commissioner found, that petitioners are responsible for providing financial assurance by virtue of their ownership of a solid waste management unit. Petitioners contend, however, that the financial assurance requirement is applicable only to owners and/or operators of a TSD facility who were, at some time, actively involved in the treatment, disposal or storage of hazardous waste, subject to the permit requirements of 6 NYCRR part 373 (see ECL 27-0917 [9]).[8] In reviewing the Commissioner's determination, we are limited to ascertaining whether it was arbitrary and capricious or affected by an error of law (see CPLR 7803 [3]). While the Commissioner's interpretation of DEC's regulations is generally entitled to deference if it is not irrational or unreasonable (see *Matter of IG Second Generation Partners L.P. v New York State Div. of Hous. & Community Renewal, Off. of Rent*

---

**7.** The parties apparently agree that the property in question has not been an active TSD facility since approximately 1992.

**8.** Indeed, the permit requirements extend throughout the active life of a TSD facility, but also continue through the closure process and, in certain cases, into a post-closure period of monitoring and remediation (see 6 NYCRR 373-1.2 [e]). A facility required to secure a post-closure permit may instead obtain an enforceable document, such as the corrective action order issued to Roth here (see ECL 71-2727 [3]; 6 NYCRR 373-1.2 [e] [3]). Petitioners do not dispute that these provisions allow DEC to impose continuing financial assurance requirements on parties, such as Roth—which, as a previous owner of this former TSD facility, remains subject to a corrective action order—until the corrective action is deemed complete, regardless of such parties' continued ownership of the premises. We further note that the ALJ found that petitioners were not bound by any obligations imposed under Roth's expired permit and rejected DEC's position that petitioners were successors or assigns of Roth who would be bound by the Roth order. Nor may petitioners be held liable for providing financial assurance merely because they purchased the property with notice of its former use and the existence of the Roth order, in which Roth expressly agreed to continue to perform the corrective action at the property and remain financially responsible therefor. In addition, petitioners persuasively argue that Wabash's willingness to enter into a consent order to provide financial assurance is not binding on them.

*Admin.*, 10 NY3d 474, 481 [2008]; *Matter of Gracie Point Community Council v New York State Dept. of Envtl. Conservation*, 92 AD3d 123, 128 [2011], *lv denied* 19 NY3d 807 [2012]; *Matterof Community Related Servs., Inc. v Carpenter-Palumbo*, 84 AD3d 1450, 1452 [2011], *lv denied* 17 NY3d 717 [2011]), where, as here, the issue is "one of pure statutory reading and analysis, dependent only on accurate apprehension of legislative intent," no deference is accorded (*Matter of New York State Superfund Coalition, Inc. v New York State Dept. of Envtl. Conservation*, 18 NY3d 289, 296 [2011] [internal quotation marks and citation omitted]; *see Matter of New York Constr. Materials Assn., Inc. v New York State Dept. of Envtl. Conservation*, 83 AD3d 1323, 1326 [2011]).

For the reasons that follow, our own analysis of the statutory and regulatory framework leads us to conclude that neither the ECL nor the regulations support the Commissioner's determination that the financial assurance requirements apply to petitioners. A basic tenet of statutory construction is that "words and phrases used in a statute should be given the meaning intended" and "will not be expanded so as to enlarge their meaning to something which the Legislature could easily have expressed but did not" (McKinney's Cons Laws of NY, Book 1, Statutes § 230 at 387-388). As petitioners accurately observe, there is nothing in the plain language of RCRA, the ECL or DEC's enabling regulations that imposes the financial assurance requirement on subsequent owners of a former TSD facility that never had, or were required to have, a TSD permit or were parties to a corrective action order on the property in question. Respondents, however, seek to impose the financial assurance requirement on petitioners by implication based on a faulty premise formed by a complex patchwork of portions of the statutes and regulations, some of which are inapplicable to the circumstances at issue here.

As previously noted, the obligations set forth in ECL article 27, title 9 are expressly applicable to owners and operators of a TSD facility (*see* ECL 27-0911). Moreover, according to the enabling statute, the Commissioner was required to "promulgate regulations for hazardous waste facilities identifying financial requirements *to be included as conditions in hazardous waste facility permits* . . . for pre-closure and post-closure facility monitoring and maintenance" (ECL 27-0917 [1] [emphasis added]). On the face of the regulations themselves, the obligation to take corrective action is contemplated *as a condition of a TSD*

*permit* and is to be specified in the permit (*see* 6 NYCRR 373-2.6 [1]). Thus, there can be no question that the clear language of the ECL and regulations expressly links thefinancial assurance requirement with a permitted TSD facility.[9] As mere subsequent owners of property where a former TSD facility was present, petitioners do not fall within the purview of such requirement.

Respondents' contention that petitioners are nonetheless required to provide financial assurance for monitoring and maintaining the CAMU is also unpersuasive.[10] A facility that is subject to corrective action is defined as property "under the control of the owner or operator seeking a [TSD] permit" (6 NYCRR 370.2 [b] [70] [ii]). While the presence of the CAMU unquestionably subjects Roth to continuing obligations,[11] inasmuch as the subject property is no longer a TSD facility, the mere presence of the CAMU does not subject *petitioners* to the financial assurance requirement.[12]

In essence, respondents seek to impose strict liability to provide financial assurance, in perpetuity, on all subsequent owners of property on which a former TSD facility was operated. Had this been the Legislature's intent, rather than relegate us to a strained analysis of multiple regulations in order to reach that conclusion, it would have done so expressly. Indeed, the Legislature did exactly that in the context of New York's "Superfund Law," which requires the owner of an inactive hazardous waste disposal site, and/or any person responsible for the disposal of hazardous wastes at such site, to take reme-

---

**9.** At least one court has held that liability under RCRA may only attach if an individual "has contributed or is contributing to the handling, storage, treatment, transportation or disposal of a solid or hazardous waste" (*Interfaith Community Org. v Honeywell Intl., Inc.*, 263 F Supp 2d 796, 844 [D NJ 2003]).

**10.** Notably, the CAMU is located entirely on Metalico's property.

**11.** Indeed, the Roth order set forth its continued obligations under the operation and maintenance plan.

**12.** We agree with petitioners that the regulation pertaining to the transfer of TSD permits (*see* 6 NYCRR 373-1.7 [a] [2]) is not properly before us. Although the amended administrative complaint alleged that petitioners had violated that regulation, respondents did not assert this argument in their motion for an order without a hearing and, accordingly, petitioners did not address such issue in their opposing papers. Noting that respondents did not make such assertion, the ALJ nonetheless addressed the issue. However, neither the ALJ nor the Commissioner specifically found that petitioners were in violation of this regulation. Under these circumstances, we agree with petitioners that the issue was not properly before the ALJ or the Commissioner and, as a result, is not appropriately before us.

dial action (*see* ECL 27-1313 [3] [a]; 6 NYCRR 375-2.5 [a] [1]).[13] Other examples of New York statutes imposing "strict liability" on property owners are the Oil Spill Act (*see* Navigation Law § 181 [1]) and the Scaffold Law (*see* Labor Law § 240 [1]). Thus, there can be no doubt that, if the Legislature had intended to impose liability on landowners for providing financial assurance under New York's version of RCRA—without regard to whether they had ever operated a TSD facility on the property in question—clear language to that effect could easily have found its place in the statute and regulations. While such a result would not be inconsistent with the laudatory environmental purposes of this regulatory scheme, absent such language, we discern no legal basis for the Commissioner to create such a requirement. To the extent that the Commissioner interpreted the regulations otherwise, such interpretation was arbitrary and capricious and affected by an error of law and we, therefore, annul his determination, as well as the penalties imposed on petitioners.

Finally, it bears noting that DEC is not left without the ability to seek redress from those parties who clearly remain obligated to provide financial assurance as a former TSD facility owner and/or party to the consent order. Nor does anything in this decision prevent DEC from seeking appropriate relief against petitioners under the Superfund Law, if circumstances arise in the future where that law is implicated.[14]

The parties' remaining contentions are either academic or without merit.

PETERS, P.J., MCCARTHY and EGAN JR., JJ., concur.

Ordered that the order and judgment is reversed, on the law, with costs, petition granted, determination annulled and respondents' counterclaim dismissed.

---

**13.** In connection with New York's Superfund Law, the Commissioner's regulations define a "responsible party" as, among other things, "[a]ny person who currently owns or operates a site or any portion thereof" (6 NYCRR 375-2.2 [i] [1]). Similarly, the Comprehensive Environmental Response, Compensatory, and Liability Act of 1980 imposes liability without regard to fault on owners of Superfund sites for hazardous waste cleanup (*see* 42 USC § 9607 [a] [1]; *Matter of Commerce Holding Corp. v Board of Assessors of Town of Babylon*, 88 NY2d 724, 729 n 3 [1996]; *Acme Print. Ink Co. v Menard, Inc.*, 870 F Supp 1465, 1475 [ED Wis 1994]).

**14.** We note that DEC does not claim that the property currently presents a significant threat to public health or the environment.